IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 16-0243 |
| Plaintiff, | ELECTRONICALLY FILED |
| v. | |
| JAMES MARK LEROY, | |
| Defendant. | |

### Tentative Findings and Rulings and Memorandum Order on Other Motions/Miscellaneous Sentencing Matters

**AND NOW,** this 3rd day of July, 2017, in accordance with Fed.R.Crim.P. 32(i) and Local Rule of Court LCrR. 32.1(C)(7), the Court makes the following findings and rulings with respect to the sentencing factors in dispute, and issues the following Memorandum Order on other sentencing matters:

### I. Introduction

On November 9, 2016, Defendant was charged in a four-count Indictment with two counts of travel with intent to engage in illicit sexual conduct in violation of 18 U.S.C. §§ 2423(b) and (e), and two counts of transportation with intent to engage in criminal sexual activity in violation of 18 U.S.C. §§ 2423(a) and (e) relating to two Minors (Minors A and B).[1]

---

[1] Defendant refers to Minors A and B, as Victims A and B throughout his Letter Objection at doc. 139. The Court notes that at the trial of this matter, Defendant's conduct against Minors A and B were included in the Indictment, while Victims 1 and 2 were not. Also, at the trial of this matter there was testimony of Victim 1, who was a minor at the time of the alleged conduct by Defendant, and is the subject of criminal charges in state court (and proposed testimony of Victim 2 which the Court excluded).

1

Because Defendant sought a prompt trial of this matter, at a status conference in this matter, the Court scheduled the trial for January 30, 2017. Doc. 27. The jury trial occurred on January 30, 2017, as scheduled, and on February 1, 2017, the jury returned a verdict of guilty on all counts. Doc. 118. The Court scheduled a sentencing hearing for June 5, 2017, doc. 120; however, upon Motion to Continue this matter (over the objection of the Government on the basis that the child victims had a right to seek closure of this matter on June 5, 2017) (see doc. 132 and doc. 134), the Court granted the Motion to Continue the Sentencing to July 11, 2017. Doc. 136.

On May 8, 2017, the Court received the Government's Position with Respect to Sentencing Factors, in which the Government states that it concurs with the computations in the Presentence Investigation Report (PSR). Doc. 127. Then, on June 13, 2017, this Court received Defendant's Objections to the PSR, which was attached to the Government's Response thereto. Doc. 137. The Probation Office, on June 14, 2017, filed its Addendum to the PSR. Doc. 140.[2] Also, on June 14, 2017, this Court filed Defendant's Objections to the PSR as a separate document of record. Doc. 139. Then, on June 23, 2017, the parties filed their respective Sentencing Memoranda and other related documents. In Defendant's Sentencing Memorandum, he reiterates the objections set forth in his letter objection and adds other arguments related to a Motion for Downward Departure and/or Variance. The Court finds that the Motion is most appropriately categorized as a Motion for Variance. Doc. 150.

**II.     Offense Conduct**

Defendant was the owner and operator of Jimi Enterprises, Inc, in Butler, Pennsylvania,

---

[2] Document Numbers without hyperlinks are sealed documents.

and the subject of an investigation conducted by the Federal Bureau of Investigation, which led to an Indictment and, ultimately, a conviction on Counts 1-4 of the Indictment. As discussed in the introduction, the conduct charged in each of the counts of conviction involved two minor age boys, Minor A, who was 13 and 14 at the time of the offenses, and Minor B who was age 10 when the offenses occurred. Both boys testified credibly and consistently at trial to the criminal actions of Defendant. The following is a summary of the testimony of Minors A and B, which has been established by a preponderance of the evidence.

### Minor A[3]

Minor A's father, a known substance abuser, worked intermittently for Defendant at Jimi Enterprises, Inc. over the course of many years. Defendant terminated Minor A's father for abusing drugs on the jobsite. Minor A (then age 13) lived with his father and stepmother during the time period charged in the Indictment, and during the summer months, Minor A (then age 13) came to work with his father to keep him out of trouble. Defendant then offered Minor A a job, and he initially received cash payments from Defendant for work that he performed. Later, Defendant opened a joint bank account for Minor A, which contained approximately $2,000.00, but the Defendant told Minor A he had no access to the funds until he turned 16.

Minor A resided briefly with Defendant and his wife when he was 13 years old, after his father was arrested. It was during this time period that Defendant first engaged in inappropriate behavior with Minor A following use of Defendant's hot tub. Minor A testified that Defendant asked him to masturbate for him in exchange for lottery tickets. Minor A did so, while Defendant watched in the bedroom where Minor A slept while he lived with Defendant. Minor A testified credibly that Defendant stacked pillows on the bed in front of Minor A in case

---

[3] The following is a summary of Minor A's testimony, which is at doc. 130 from pp. 49-147.

Defendant's wife were to enter the room. Defendant then gave him $200 worth of lottery tickets, and although Minor A testified that Defendant did not caution Minor A to keep secret what had transpired on this occasion, Minor A explained to the jury that Defendant made that request on other occasions.

Minor A further testified that Defendant touched his penis several times with his left hand until Minor A ejaculated, and this most regularly occurred in Minor A's room, and once in the garage of Defendant's home. Defendant also massaged Minor A's back, thighs, and legs on different occasions, and after these sexual encounters, Defendant plied Minor A with gifts, including money, a dirt bike, a Playstation gaming system and other items.

Minor A testified that Defendant took him on trips outside of Pennsylvania on several occasions, including two trips to Florida, and the second trip, which occurred on June 28–July 1, 2015, was the subject of extensive testimony as well as exhibits showing the travel documents. Minor A testified that Defendant bought Minor A clothes and new tennis shoes, as was revealed in a trial exhibit photograph. Minor A further explained that Defendant permitted Minor A to drive the rental vehicle upon arriving in Jacksonville, Florida, paid for his expenses, including the purchase of cigarettes and alcohol which Minor A consumed while with Defendant. While staying at the hotel in Florida, Minor A testified that Defendant again manually stimulated him until Minor A ejaculated, and Minor A was naked when this occurred because Defendant removed Minor A's clothes, but that Defendant was clothed. Following this incident, as in the past, Minor A testified that Defendant paid him approximately $300.00, which he used to buy lottery tickets. Minor A also testified about a trip he and Defendant took to Texas, and during that trip, Defendant again manually stimulated Minor A's penis, and

4

afterwards Defendant paid him an unspecified amount of amount.

Minor A further provided extensive testimony, with related travel exhibits, regarding a trip that he and Minor B took to Michigan with Defendant on February 13-16, 2016. The Court notes that the details of this trip were recited by both Minor A and Minor B with remarkable consistency. Defendant drove Minors A and B in his work van to visit a waterpark called Safari Joe's, at which the Minors swam, but Defendant did not. Minor A testified that Defendant paid for them to swim, and gave Minor A alcohol during this trip, including at the hotel where they stayed. Defendant also encouraged Minor A to give Minor B alcohol, and Minor A testified that Minor B in fact drank Mike's Hard Lemonade to the point of intoxication, as he was not able to walk straight, and eventually Minor B fell asleep on the bed next to Minor A.

Minor A (and Minor B) testified consistently that, during a trip to a Subway restaurant, Defendant put the contents of crushed pills on Minor B's subway hoagie. Minor A testified that Defendant told him what he had done with the hoagie, and on another occasion Minor A prevented Minor B from eating pizza that was contaminated and Minor A testified that he was fearful of what Defendant might have done to Minor B if he ate the pizza. Minor A also testified that he stood up to Defendant and actually hit Defendant for what he did. Later that night, Defendant touched Minor A's penis again and he further testified that he stayed up all night because he was fearful of what Defendant would do to Minor B.

Minor A testified about a night that he and Minor B spent at Defendant's home, at which they rode dirt bikes, and then went into Defendant's hot tub. Afterwards, Defendant gave both Minors ZzzQuill and then he massaged both of them. Minor A testified about another trip to Oglebay, West Virginia, that he took with Defendant, Minor B, and two younger boys. During

5

that trip, Minor A testified that he saw Defendant "ball tap" Minor B often, which he described as a "punch" to the testicles. Doc. 130 at 106.

Minor A also credibly testified about his drug use, and that Defendant supplied him with Valium, Percocet, and Vicodin at other times. Defendant had Minor A drug tested on two occasions, and the second time occurred after one of their trips. Minor A indicated his belief that the drug test was negative and that Defendant told him that he obtained two test result confirmation forms from the testing site, in case one of the tests was positive. If that occurred, according to Minor A's testimony, Defendant had told Minor A he would alter the paper to show a negative test. Minor A described his drug use, including marijuana and crack cocaine, with other associates of Defendant, and that on one occasion, an associate of Defendant provided him with the drugs while helping him clean his basement. Minor A further explained that he had told his mother, who told his father of the Defendant's sexual conduct towards him, but that his father told his mother that no one would believe him because Defendant was "too much of a good guy for this." Doc. 130 at 117.

**Minor B[4]**

Minor B developed a relationship with Defendant when he and his older brother began working for him, as two of his uncles also worked for Defendant. Defendant paid him $40.00 every Saturday for taking valve stems out of tires. Minor B used most of his money on snacks and sports equipment. He went to Defendant's house to ride dirt bikes and to use his hot tub. Defendant and Minor B went into the hot tub together on numerous occasions, and Minor B described one occasion when Defendant removed his boxers while they were in the hot tub and threw them outside of the hot tub. Minor B jumped out of the hot tub immediately and retrieved

---

[4] The following is a summary of Minor B's testimony, which is at doc. 129 from pp. 177-235.

his boxers and put them back on. Afterwards, Defendant drove Minor B home and he told no one about what happened that night.

Minor B also testified about the time he and Minor A slept at Defendant's home, and how they had gone into the hot tub with Defendant, that Defendant gave him pajamas afterwards, and Defendant gave them ZzzQuill. Minor B testified that Defendant told them it would make them fall asleep quicker so that they could get up for church in the morning. Before Minor B fell asleep, Defendant massaged his back, feet, and calves. Minor B testified that he was awake when Defendant left the room.

Minor B testified regarding the trip Defendant took with him and Minor A to Oglebay, West Virginia and also referred to the "ball tapping" incident, and that it hurt enough for him to guard himself with his hand, but he never told Defendant to stop.

Minor B's testimony regarding the trip he took with Minor A and Defendant to Michigan was parallel to and consistent with the later testimony of Minor A. He described his trip to Subway, and the funny taste of the hoagie, and that he threw it away after eating a quarter of it. Minor B credibly testified regarding his consumption of Mike's Hard Lemonade at the hotel with Minor A and Defendant and that he was intoxicated to the point of not being able to walk straight, and eventually he fell asleep on Minor A's bed. On the second night of the trip, Minor B testified that Defendant massaged his feet, leg, and back. Minor B testified also about numerous gifts he received from Defendant including a Christmas stocking containing gift cards, toys, money for the arcade, and trip to amusements centers throughout Western Pennsylvania.

### III.     Specific Objections to the PSR

In his letter objection, and Sentencing Memorandum, Defendant advances the following

objections to the PSR ([doc. 139](doc. 139) and doc. 150):

>   Paragraph 11: Minor A was taken to Florida only once.

>   Paragraph 17: There is no evidence that the drug tests in fact were fabricated in any way.

>   Paragraph 32 (and corresponding adjusted offense levels at Paragraphs 37, 40, 45, 49 and 77): the 2-level enhancement under § 2G1.3(1)(B) of the Sentencing Guidelines regarding undue influence is inapplicable.

>   Paragraph 50 (and corresponding paragraph 52): the 5-level enhancement pursuant to § 4B1.5(b) which increases the offense level for a "Repeat and Dangerous Sex Offender Against Minors" is inapplicable.

>   Paragraph 61: Defendant's business is now closed.

>   Paragraph 67: Defendant received a welding certificate and not a degree.

>   Paragraph 69: Defendant never owned a welding business.

>   Paragraph 75: Counsel is in the process of obtaining financial information.

>   Paragraph 77: In light of the above objections, the Total Offense Level is 39 and with a Criminal History Category of I, and his sentencing range is 262-327 months imprisonment.

Many of the above objections (specifically paragraphs 61, 67, 69, 75, and 85), while noted, do not affect the Sentencing Guideline Calculations and therefore, the Court need not resolve these disputes

The Court will consider the Defendant's objections to the PSR in chronological order.

**A. Paragraph 11**

Defendant posits that Minor A was taken to Florida only once, and therefore, challenges the conclusion of paragraph 11 of the PSR. However, the uncontradicted testimony at trial by

Minor A reveals that he went to Florida with Defendant on more than one occasion. He stated:

> Q: Have you ever been to the State of Florida?
>
> A: Yes.
>
> Q: Who took you to Florida?
>
> A: Jim [LeRoy]
>
> Q: Did you go on one occasion or more than one occasion?
>
> A: More than one.

Doc. 130 at 68. While this fact does not affect the Guideline calculation in the PSR, the Court finds that the credible testimony by Minor A established that Defendant went to Florida with Minor A more than once.

### B. Paragraph 17

Defendant posits that there is no evidence that the drug tests were fabricated, and therefore, he objects to the explanation in paragraph 17 regarding Minor A's testimony thereon. The Court agrees with the Government that whether or not the drug tests were, in fact, fabricated, is immaterial, as Minor A testified at trial to his belief that the Defendant had the ability to misrepresent the results of a drug test.

Minor A testified about Defendant: "whenever he took me up there, he asked the lady that was giving the drug test for two papers. And Jim told me that if one of them came out positive, he was going to make one negative. So he didn't get in trouble with them, because I was with him that whole, like those couple days." Doc. 130 at 142-43. While the Court notes that Minor A believed that Defendant had the ability to manipulate the tests results, no drug test results were offered by either party.

## C. Paragraphs 32 and 40 (and corresponding adjusted offense levels at Paragraphs 37, 45, 49, and 77): the 2-level enhancement pursuant to § 2G1.3(1)(B)

Defendant objects to the applicability of a 2-level enhancement, and the resulting offense level calculations under § 2G1.3(1)(B) of the Sentencing Guidelines. Section 2G1.3(1)(B) increases a defendant's base offense level where there is a "undue influence". Here, because the age difference between Defendant and the minors is in excess of 10 years (Defendant was over 50 years of age, Minor A was 14 years of age, and Minor B was 10 years of age at time of Indictment), according to the Application Note (3)(B), there is a "rebuttable presumption" that the undue influence enhancement applies.

The trial testimony established that the gifts Defendant provided to the victims in conjunction with alcohol and pills compromised the victims' behavior. Application Note 3 further provides that "in determining whether subsection (b)(2)(B) applies, the Court should closely consider the facts of the case to determine whether a participant's influence over the minor compromised the voluntariness of the minor's behavior." The Court notes that the Application Note also specifically states that "the voluntariness of the minor's behavior may be compromised without prohibited sexual conduct occurring."[5]

Defendant contends that the rebuttable presumption is overcome because Minor A contributed to the distribution of alcohol to Minor B and because evidence at trial did not establish sexual conduct with Defendant. Defendant's argument fails because the testimony at trial established by a preponderance of the evidence that Defendant exploited his child victims by providing them with cash, video games, and dirt bikes, among other things. These victims had

---

[5] In any event, Defendant's position that there was no evidence at trial that Minor B (which Defendant refers to as Victim B – see FN. 1) ever engaged in sexual conduct with Defendant is overbroad.

10

family problems and were of limited financial means. Defendant compromised his victims by giving them alcohol, prescription pills, and sleep aids (ZzzQuill). In fact, both Minor A and Minor B described the Subway sandwich purchased by Defendant for Minor B that was tainted with some type of crushed up pill. Also, Minor B consumed 2 ½ bottles of Mike's Hard Lemonade, purchased by Defendant, in the Defendant's hotel room in the presence of Defendant (and Minor A), and Minor B was so intoxicated that he fell on the floor. Minor A's conduct has no bearing on the application of the enhancement. In any event, Minor A testified that Defendant's conduct with Minor B was the catalyst for causing Minor A to punch Defendant and disclose Defendant's conduct to adults. Doc. 140 at 95-97.

As for Defendant's position that the presumption was overcome because Minor A was able to voluntarily "remove" himself from Defendant's home when he was residing with him, that position is untenable, for the reasons explained above. *See United States v. Lay*, 583 F.3d 436 (6th Cir. 2009)(53 year-old could not rebut the presumption of undue influence over 15 year old by claiming that child instigated relationship).

Because the enhancement at § 2G1.3(b)(2)(B) is factually applicable as to both Minor A and Minor B, Defendant's adjusted offense level for Minor A is 34 and for Minor B is 40. Accordingly, the combined adjusted offense level is 41.[6]

---

[6] In Defendant's Sentencing Memorandum, he contends that the application of the rebuttable presumption under the Sentencing Guidelines unconstitutionally shifts the burden of proof to Defendant, thereby improperly eliminating the Government's burden to prove the facts by a preponderance of the evidence. The Court finds that, setting aside the presumption of undue influence, the facts at trial more than adequately demonstrate the applicability of the undue influence enhancement by a preponderance of the evidence. The conduct of Defendant was repeated and serial in nature in that he exposed his victims to drugs, alcohol, and sleep aids on numerous occasions, and that he used money and gifts to coerce the victims.

### D. Paragraph 50 (and corresponding paragraph 52): the 5-level enhancement pursuant to § 4B1.5(b)

Defendant next contests the application of § 4B1.5(b) which increases the offense level for a "Repeat and Dangerous Sex Offender Against Minors." In support, Defendant, citing *United States v. Begin*, 696 F.3d 405, 408 (3d Cir. 2012), argues that Application Note 4(B)(ii) contemplates that but a single instance of any pattern of activity may occur during the course of the instant offense, and that all other instances constituting a pattern must be prior to the instant offense conduct. Application Note 4 in fact clarifies the determination of a pattern of activity: "the defendant engaged in a pattern of activity involving prohibited sexual conduct with a minor." The Application Note further explains that "an occasion of prohibited sexual conduct may be considered for purposes of subsection (b) without regard to whether the occasion (I) occurred during the course of the instant offense; or (II) resulted in a conviction for the conduct that occurred on that occasion."

The Chapter Four enhancement at § 4B1.5(b) is applicable for numerous reasons. First, Minor A testified that when he was 13 years of age, Defendant dared and enticed him to masturbate in the presence of Defendant in exchange for more than $200 worth of lottery tickets. Doc. 130 at 61-62. Also, Minor A testified that Defendant touched him inappropriately on "multiple" occasions in addition to the conduct by Defendant in Florida, Texas, and Michigan. Doc. 130 at 62. Minor A's testimony establishes a pattern of activity on at least two separate occasions. Second, Victim 1 testified at trial that when he was 12-13 years old, Defendant pulled Victim 1's boxers down, and eventually pulled them off and threw them outside of the hot tub. Doc. 130 at 203.[7]

---

[7] Although Victim 2 did not testify at trial because the Court granted Defendant's Motion to exclude such testimony,

This Court finds that any one of the above instances would be sufficient to establish the applicability of the § 4B1.5(b) enhancement. And, this Court agrees with the Government that the *Begin* case is inapposite, because in that case, the defendant was properly enhanced for his multiple pattern criminal violations against children and he was charged under different federal statutes. 696 F.3d at 408. Because the 5-level enhancement is appropriate here, the correct offense level is as set forth at paragraph 52 - - a 43, not a 39, as Defendant contends.

### E. Paragraphs 61, 67, 69, and 75

Defendant has made several additions and corrections to paragraphs 61, 67, 69 and 75, none of which affect the Guidelines calculations. In the Addendum, the Probation Office notes that it has added said information to the PSR. Doc. 140.

### IV. Memorandum Order on Miscellaneous Pending Motions/Other Matters

### A. Defendant's Motion to Share Victim Statements (doc. 146)

On June 23, 2017, Defendant, through his newly-retained counsel, filed a Motion to Share Victim Statements and/or interviews with retained forensic psychologists. Doc. 146. The Government opposed this request and argued that Defendant proffered no legitimate basis for sharing these materials with his retained psychologists as the trial transcript of this matter is sufficient. Doc. 154. The Government speculated that Defendant intended to improperly attack the Minors' veracity as to the crimes upon which Defendant has been found guilty.

In Defendant's Reply, he states that he intends to use these statements to address issues which are most appropriate for the appeal of this matter. Doc. 163. Specifically, Defendant argues that "it is very likely that the children's testimony in this case may have lacked reliability

---

the Government has offered a transcript of Victim 2's prior testimony (under oath) which further bolsters the application of this enhancement because it establishes a "pattern" of sexual activity involving minors. However, because of confrontation issues, this Court has not relied on said testimony in applying this enhancement.

due to the number of interviews that were conducted and the manner in which the children were interviewed." Doc. 163. The Court, after having heard the testimony of Minors A and B, as well as Victim 1, and having observed their demeanor, finds that the testimony of these witnesses was not only highly credible, but also, they gave remarkably consistent accounts of their experiences with Defendant. The jury obviously also so assessed the veracities of Minors A and B (and Victim 1). Additionally, the physical evidence introduced throughout this trial overwhelming supported and corroborated the testimony of Minors A and B. Moreover, any suggestion by Defendant that the psychologist used suggestive interviewing techniques is belied by the above. The Court finds the testimony of both the interviewing psychologist and the Government expert to be credible, their demeanor professional, and their breadth of knowledge on this subject was extensive.

Defendant next suggests that the other purpose of having his experts review the victim witnesses' statement and interviews is to determine whether Defendant's prior counsel was ineffective in not asking his retained expert to examine these statements for possible "taint." Doc. 163. As stated by the Government in its sur-reply, "allegations of the ineffective assistance of trial counsel are not relevant to sentencing considerations and cannot serve as a legitimate basis for review of the transcripts of the forensic interviews by Defendant's retained psychologists at this juncture." *See Berry v. United States*, 2009 WL 1765845, at *4 (W. D. Pa. June 22, 2009).

This Court likewise can see no legitimate basis for Defendant to require these materials, which address the impact of Defendant's crimes on the minor victims. However, the Court notes that the Government in the spirit of cooperation, has consented to the disclosure of the transcripts

14

of the minor victims' forensic interviews to Defendant's retained psychologists and identified members of the defense team, who are working on Defendant's case. Doc. 165.

For these reasons, this Court hereby DENIES AS MOOT Defendant's Motion thereon (doc. 146), and instead will sign the proposed (revised) Protective Order submitted by the Government at doc. 165-1, by separate Order of Court this date.

**B. Defendant's Motion for Reconsideration (doc. no. 150)**

On June 22, 2017, the Government previously filed a Motion for Order of Court that Defendant, his counsel, his private investigator and other agents or associates of Defendant be prohibited from contacting witnesses including Minor A, Minor B, Victim 1, Victim 2, or their immediate families (doc. 141), and the Court granted said Motion by Order (doc. 142), but invited Defendant to file a Motion for Reconsideration if he had any objection thereto.

On June 23, 2017, as part of Defendant's Sentencing Memorandum, he seeks Reconsideration of the no-contact Order on the basis that the allegations are "spurious," and that he has a right to interview witnesses, where, as here, he has a pending state criminal matter. Doc. 150.

On June 30, 2017, the Government responded in opposition and stated that: "The child victims (Minor A, Minor B, Victim 1, and Victim 2) and their families all have definitively told FBI Special Agent Thomas Carter that they do not want to have any contact with James Leroy and his associates, particularly his private investigator, Larry Forletta. Moreover, for all of the reasons previously set forth in the government's motion at Docket No. 141, such an order is necessary." Doc. 167. In light of the Government's representations, the Court sees no valid basis to reconsider its prior no-contact Order as there is no error of law, fact or other new

15

evidence that the Court has failed to consider.

In Defendant's Supplemental Status Report, he contends that "if the Government persists in claiming that Mr. LeRoy has been attempting to obstruct justice by attempting to get Minors A and B and Victims 1 and 2 to recant their testimony, upon being notified which such witnesses were allegedly contacted by investigator Larry Forletta or anyone else on Mr. LeRoy's behalf, I may want to ask for their presence at the sentencing hearing to be cross-examined on this." [Doc. 164](). The Court notes that this information has not been taken into account in the PSR calculations, nor will it be used by this Court as a sentencing factor. Accordingly, there is no basis for any such testimony thereon and Defendant's Motion for Reconsideration (at doc. 150) is DENIED.

### C. Fine/Financial Ability to Pay Monetary Sanctions

On May 5, 2017, nearly 60 days ago, the PSR unequivocally identified 5 of the 6 items (listed below) which Defendant was required to produce in order for the Court to properly assess Defendant's financial ability to pay monetary sanctions (doc. 126 at ¶ 75). As of this date, Defendant and/or his counsel have failed to provide said documents.

Accordingly, by **9:00 a.m. on July 6, 2017**, Defendant and/or his counsel must provide the Court (through the probation officer) with the following information: (1) a receipt of the sale of the business assets and documentation to show how or to whom the proceeds were dispersed; (2) a list of creditors who are still owed money; (3) bank statements to show the availability of any funds remaining in the business accounts; (4) bank statements to show the availability of any funds in the defendant's personal bank accounts; (5) proof of any valuable assets still in the defendant's or his wife's possession and, (6) copies of the defendant's personal tax returns for the

16

past three years, up to and including 2016. The Probation Office will then file a short (second) Addendum to the PSR and revised Sentencing Recommendation, addressing Defendant's ability to pay the monetary fine and/or any fine under the Justice for Victims Trafficking Act (JVTA). The requirements of this Order may not be used by Defendant in support of any Motion to Continue the Sentencing of this matter.

### D. Motion for New Trial/Motion to Continue ([doc. 169](#))

At 5:20 p.m. on Friday, June 30, 2017 (on the Fourth of July weekend), Defendant has filed a Motion for New Trial, for leave to file this Motion out of time, leave to supplement the Motion within seven days of filing excluding July 4, 2017, and for a continuance of the July 11, 2017 sentencing in this matter. [Doc. 169](#). On Monday, July 3, 2017 at 8:11 a.m., this Court promptly filed an Order setting response thereto from the Government by July 6, 2017 at noon. Doc. 170.

An Order thereon will be issued pending the Government's response, but the Court surmises that on the face of the current Motion, the Court is not inclined to grant any request for additional continuance of the July 11, 2017 Sentencing Hearing.

### V. Sentencing Memoranda of the Parties

In Defendant's Sentencing Memorandum, Defendant seeks a downward departure/variance, on the basis of: (1) his objections to the PSR; (2) Defendant's reputation for good works in the community as evidenced by the numerous character letters submitted on his behalf; (3) mitigating testimony that certain potential witnesses found allegations against Defendant to be incredulous; and, (4) sentencing data establishing that most criminal defendants who are sentenced under § 2G1.3, whose Guidelines were life received a sentence of less than

17

life with fully a third of such below Guidelines sentences. Defendant seeks a sentence of 120 months imprisonment and 5 years of supervised release. This Court finds that although none of the arguments by Defendant support a downward departure under these circumstances, the Court will take Defendant's arguments for variance into account in fashioning an appropriate sentence.[8]

To reiterate, the Court finds that Defendant must serve a significant custodial sentence for this most reprehensible pattern of criminal conduct. The testimony at trial established that Defendant's conduct undoubtedly injured Minors A and B, who clearly have numerous unresolved psychological problems that they have faced and will continue to face in the future, and the factual circumstances here, as gleaned through the trial testimony, are quite disturbing and are among the most serious of all the criminal Defendants who have come before this Court who have been charged with similar crimes involving the sexual victimization of children.

This Court further recognize that the Government, in its original Sentencing Memorandum (doc. 151), discussed a sentence at variance with the Guideline Range, and stated that if the Court is inclined to vary, it suggested a downward variance to an offense level of 41 which corresponds to a sentencing range of 324 to 405 months imprisonment. However, in its most recent Sentencing Memorandum (doc. 168), the Government now seeks a sentencing Range of 262 to 327 months imprisonment, which represents a downward variance from the Guideline Range, and is the same Guideline Range suggested by Defendant were the Court to grant his objections to the PSR.

---

[8] As the Government explains in its response to Defendant's Sentencing Memorandum, and this Court agrees, "[a]lthough the [D]efendant has not articulated a textual basis for a departure, generally speaking, in terms of the Sentencing Guidelines, offender characteristics such as family ties and responsibilities (§5H1.6), employment record (§5H1.5), and prior good works are not 'ordinarily relevant' in determining whether a departure is warranted. Introductory Commentary to Par H – Specific Offender Characteristics, U.S.S.G. 2015."

## VI. Conclusion

Based upon the foregoing, the PSR correctly calculates a total offense level of 43 and a criminal history category of I, thereby yielding a Sentencing Guideline Range of Life, but a statutory maximum of 30 years (360 months) as to Counts 1 and 3, and not less than 10 years (120 months) to life at Counts 2 and 4.

The Court further notes that restitution in this case is mandatory pursuant to 18 U.S.C. § 3663A(c)(1)(A)(i) and that the amount the Government seeks of restitution for Minors A and B is fair and reasonable under these circumstances. Doc. 152. A final determination of the amount of restitution will occur at the Sentencing Hearing, this Court notes that the parties (doc. 166) in the Joint Status Report regarding Restitution (doc. 166) have agreed to the amount of Restitution requested by the Government. The Court further notes that the parties further agreed that the Clerk of Court should be directed not to make disbursements to the minor victims until Defendant's appeal is resolved.

The Court will entertain further oral argument at the sentencing hearing, and will take said arguments into consideration when fashioning an appropriate sentence after considering all of the 3553(a) factors.[9]

---

[9] Finally, the Court notes that in Defendant's Sentencing Memorandum (doc. 150), he seeks a recommendation that Defendant be designated to FCI Elkton, Ohio.

The sentencing proceeding scheduled for July 11, 2017, at 9:30 a.m., will proceed in accordance with the foregoing findings and rulings.

**SO ORDERED** this 3rd day of July, 2017.

s/Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc: All Registered ECF Counsel and Parties