IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

                Plaintiff,

    v.

JAMES MARK LEROY,

                Defendant.

          Criminal No. 16-0243
          ELECTRONICALLY FILED

## <u>Memorandum Opinion on Motions to Vacate Sentence (Doc. No. 221, Doc. No. 225 and Doc. No. 241)</u>

### I.    **Introduction**

Defendant, James Mark Leroy (hereinafter "Defendant" or "Leroy"), was charged with and convicted by a jury of a Four-Count Indictment charging travel with intent to engage in illicit sexual conduct (two counts) and transportation with intent to engage in criminal sexual activity (two counts) (in violation of 18 U.S.C. Sections 2423 (a) and (e), and (b) and (e), respectively), stemming from his conduct with regard to two Minor Child Victims, MK and MD.  In the face of devastating evidence against his client, experienced, well-respected and competent trial counsel waged a hard-fought battle with the Government by choosing to put the Government to its burden and not presenting evidence on Defendant's behalf.  While it was a reasonable trial strategy, due to the voluminous and consistent evidence put forth by the Government, Defendant was ultimately found guilty of all counts.  Defendant's post-trial motions and appeal were not successful, and he now petitions the Court for collateral relief.

Currently pending is perhaps the most comprehensive briefing this Court has ever seen on a Motion to Vacate Sentence in a criminal matter.  The Motions of Defendant contain over

600 pages of briefing, and literally thousands of pages of exhibits, including Affidavits and Statements by numerous witnesses, filed by his third retained defense counsel.

The filings commenced with an original Motion to Vacate (Doc. No. 216, which was denied without prejudice), an Amended and Redacted Motion to Vacate (Doc. No. 221 and Doc. No. 225), a Supplemental Motion to Vacate (Doc. No. 241), following the Court-ordered filing of an Affidavit by trial counsel (Doc. No. 238-1), and a Reply to the Government's Response. Doc. No. 253.

The sheer volume and breadth of the allegations of ineffectiveness of trial counsel raised by newly hired defense counsel, is remarkable, and the myriad contentions of ineffectiveness are numerous, detailed, and riddled with sensational claims.  Defendant's capacious briefs are, however, highly speculative, and invite this Court to engage in impermissible conjecture, which is devoid of a compelling basis grounded in fact or case law to support his claims of violation of his constitutional right to effective representation, and the sweeping relief he requests (a new trial or a hearing).

Accepting Defendant's factual contentions as true, he cannot overcome the significant hurdle of proving that he was prejudiced by trial counsel's course of conduct or that trial counsel's conduct was unreasonable or deficient.  In other words, Defendant has not established a reasonable probability that the result of the trial would have likely been different, had trial counsel conducted the trial in the manner suggested by Defendant's (third) newly retained counsel. Defendant's claims necessarily fail under the applicable precedent of *Strickland v. Washington*, 466 U.S. 668 (1984).[1]

---

[1] In the Discussion Section of this Memorandum Opinion, the Court will first address the second prong of the prejudice standard in *Strickland,* and although not necessary, in the interests of completeness, will next address whether trial counsel's conduct was unreasonable or deficient.

In the dramatic opening lines of Defendant's (Amended and Redacted) Motion, he boldly claims that "the worst kept secret in Butler, Pennsylvania is that [the Minor Child Victims] fabricated their allegations against [Leroy]," and "the Butler County community knows why these boys fabricated their allegations against [Leroy] . . ." claiming that the group of boys were somehow avenging the firing of MK's father by Leroy due to "jealousy and greed."  Doc. No. 225 at 10.

Of course, it is not the mission or duty of the Court to countenance the gossip and conjecture of community members.  Instead, it is the mission and duty of this Court to fairly preside over and conduct pretrial and trial proceedings in compliance with the law, not to submit to the whims of the "court of public opinion."  As this Court has previously surmised and continues to maintain in this Opinion, the credible and overwhelming evidence submitted by the Government at trial handily established Defendant's guilt to the Four Count Indictment.

As the presider of the trial of this matter, this Court, just like the jury, who properly discharged its duty, heard, saw and observed the demeanor of the numerous credible Government witnesses (including two Minor Child Victims and a third Victim Witness), and viewed properly admissible attendant documentary evidence.  The verdict of guilty on all charges was amply supported by the overwhelming weight of the evidence.

## II.    Procedural History

### Charges and Pretrial Proceedings

On November 9, 2016, Defendant was charged by the Grand Jury in a four-count Indictment with two counts of travel with intent to engage in illicit sexual conduct in violation of 18 U.S.C. § 2423(b) and (e), and two counts of transportation with intent to engage in criminal sexual activity in violation of 18 U.S.C. § 2423(a) and (e) relating to two Minor Victims (Minors

A and B – MK and MD).  Charges at Counts One and Two are related to Defendant's travel with Minor A (MK) to Florida, from on or about June 28, 2015, to July 1, 2015, and charges at Counts Three and Four are related to his transportation of Minors A (MK) and B (MD) to Michigan, from on or about February 13, 2016, to February 15, 2016.  Doc. No. 54 at 1.

Defendant was arrested a few days later and, after privately retaining a highly-respected and experienced criminal defense attorney, Steven Townsend (hereinafter, "trial counsel"), on November 22, 2016, he pleaded not guilty and insisted on a prompt jury trial.  Doc. No. 16.  At the first status conference before this Court, Defendant was adamant that the matter "proceed as quickly as possible."  Doc. No.195 at 3.  This Court initially offered a trial date of March 6, 2017, but Defendant requested that he "have his trial within the seventy days from the date of his initial appearance and arraignment" (no later than January 31, 2017).  Doc. No. 195 at 3-4; Doc. No.27.

**Trial and Post-Trial Proceedings**

The three-day jury trial occurred on January 30 and 31, 2017, as requested by Defendant, and on February 1, 2017, the jury returned a verdict of guilty on all counts.  Doc. No. 118.  The Court scheduled a sentencing hearing for June 5, 2017 (Doc. No. 120); however, upon Defendant's Motion to Continue this matter (over the objection of the Government on the basis that the child victims had a right to seek closure of this matter on June 5, 2017) (Doc. No. 132 and Doc. No. 134), the Court granted the Motion to Continue the Sentencing to July 11, 2017. Doc. No. 136.

New sentencing counsel, Alan Ellis, entered his appearance on the record on May 9, 2017.  Doc. No. 128.  On June 30, 2017, approximately five business days before the rescheduled July 11, 2017, sentencing hearing, and a month and a half after Mr. Ellis entered his

appearance, Defendant filed a Motion for a New Trial, and in it, sought sweeping remedies, including that the jury verdict of guilty be nullified, and that the Court should consider his numerous allegations of trial counsel's ineffectiveness.  Defendant's Motion primarily relied on two contentions: "potential significant ineffective assistance" and "possible prosecutorial misconduct[.]" Doc. No. 183 at 4.[2]

Defendant's first claim challenged trial counsel's handling of the Government and Defense experts (Dr. Valliere and Dr. Zakireh, respectively), specifically alleging trial counsel's ineffectiveness "for failing to make a renewed motion to strike after Dr. Valliere gave 'vague and inconsistent' trial testimony; that Dr. Valliere's testimony was 'misleading' because it was 'almost entirely case-specific' that Dr. Valliere's testimony was the 'lynchpin,' of the case; that trial counsel failed to 'investigate Dr. Valliere's credentials;" and failed to call defense expert Dr. Zakireh, based upon scheduling conflicts. Doc. No. 183 at 7; Doc. No. 169.

On July 10, 2017, by Order at Doc. No. 183, this Court denied Defendant's Motions as untimely, without merit, and because most of the arguments raised by Defendant were actually allegations of ineffectiveness of trial counsel, the Court found them improper at that time by acknowledging the United States Court of Appeals for the Third Circuit's preference for these claims to be addressed on collateral review.  Doc. No.183 at 5-9.  The conclusion that Defendant's claims were without merit rested on the Court's observation of the "totality of the evidence and having observed the demeanor of the witnesses and their testimony." Id. at 6. Defendant also claimed there was possible prosecutorial misconduct based on Dr. Valliere's alleged falsification of her credentials. Id. at 7 and n.4. This Court rejected these arguments, explaining that the result of the trial would not "even possibly, let alone a reasonable probability,

---

[2] Attorney Ellis has not filed a motion to withdraw his representation of Defendant.

have been different here, had the testimony of Dr. Valliere been discounted, refuted, or eliminated," Doc. No.183 at 7, and explained: "In the view of this Court, Dr. Valliere's testimony was not, as Defendant claims, the lynchpin of the case. Rather, if there was a lynchpin, it was the remarkably consistent testimony of Minor [Victims] A and B, and the attendant documentary evidence that supported their accounts." Id. at 8.

Defendant had also contended in that same filing that counsel was ineffective in failing to investigate or call exculpatory witnesses who could have testified that Defendant mentored other children of the community, including troubled youth, without inappropriate behavior.  As this Court explained by Memorandum Order at Doc. No. 183, a defendant charged with sexual offenses is not permitted to offer character evidence that he treated other children well or had been entrusted to care for other children. *Gov't of V.I. v. Suarez*, 242 F.App'x 845, 849-50 (3d Cir. 2007) (evidence that defendant had cared for defendant's sister's children in the past without incident was properly excluded).

On July 11, 2017, following the extensive and contested sentencing proceedings, including the issuance of detailed Tentative Findings and Rulings, this Court sentenced Defendant to concurrent terms of imprisonment of 360 months, lifetime supervised release, a fine in the amount of $125,000, JVTA Assessment in the amount of $20,000.00, and restitution for a total amount of $25,000.00 (restitution to the Minor Child Victims in the amount of $15,000.00 to MK and $10,000.00 to MD).  Doc. No. 171, Doc. No. 184, and Doc. No. 192. Defendant perfected an appeal through sentencing/appellate counsel, but the Court of Appeals for the Third Circuit affirmed his conviction on September 6, 2019, by a non-precedential Opinion filed on the docket on October 8, 2019.  Doc. No. 211-1.  Defendant did not petition the United States Supreme Court, rendering his conviction final on December 5, 2019.

**Pending Motions for Post-Conviction Relief**

Newly retained counsel, Craig M. Cooley, entered his appearance on behalf of Defendant on November 24, 2020.  Doc. No. 215.  Also on November 24, 2020, Defendant, through counsel, filed his first Motion to Vacate Sentence, which this Court dismissed without prejudice. Doc. No. 216, and Doc. No. 218.   On March 31, 2021, Defendant filed an Amended Motion (which is 182 pages long) (Doc. No. 221), together with hundreds (468) of pages of exhibits (including the Affidavit of Defendant).  Following the Government's Motion to Compel trial counsel to provide an Affidavit and Other Pertinent Information, and Defendant's Response, the Court issued a Memorandum Order granting the Motion to Compel trial counsel to submit an Affidavit and other materials by January 10, 2022.  Doc. No. 226, Doc. No. 230, and Doc. No. 234.

On January 10, 2022, trial counsel, Steven Townsend, filed (through Government counsel) his Court-Ordered Affidavit (titled "Verified Statement in Response to the Court's Order, Document 234").  Doc. 238-1.  In his seven-page verified statement, Attorney Townsend addressed all six claims raised in Defendant's Amended Motion to Vacate, and explained that it was Defendant's insistence that the trial occur in January 30, 2017, over trial counsel's objection, because a trial date of March of 2017 would have given trial counsel more time to prepare.  Doc. No. 238-1.

On March 8, 2022, Defendant used that Affidavit to file a Supplemental Amended 2255 Petition, which contained another 73 pages of argument.  Doc. No. 241. On September 30, 2022, the Government Responded in Opposition with 86 pages of argument, and counters that, based on the well-established facts of this case and case authority, Defendant is not entitled to any of the relief that he seeks.  Doc. No. 247.  Defendant submitted his (136 page) Reply on February

14, 2023.  Doc. No. 253.[3]  This matter is now ripe for decision.

### III.    Facts as Established at Trial

In the Government's Response in Opposition, it has provided the following

comprehensive, fair, and accurate narrative of the facts established at trial.  Doc. No. 247.  In the

interests of efficiency, completeness, and to preserve judicial resources, this Court quotes the

following factual history (in a double-spaced format for ease of reading):

Leroy owned and operated JIMI Enterprises, a shop that repaired trailer axles and tires in

Penn Township, Pennsylvania. See Doc. No. 205 at 166-67; Doc. No. 206 at 51. Leroy employed

men for the heavy work at JIMI, but he also hired several young and early-teenaged boys, paying

them in cash. Doc. No. 205 at 182; Doc. No. 206 at 52, 123-24. Leroy was wealthy and respected

in his community and to outward appearances he was a "good guy:" His business was so

profitable that he always had thousands of dollars in cash with him, and he attended church. Doc.

No. 205 at 197, 226, Doc. No. 206 at 107, 117.

**Leroy hires MK[4], the son of one of Leroy's adult employees**

One of the young boys hired by Leroy was MK, who Leroy hired in mid-2014 to repair

axles for $5.00 per hour. Doc. No. 206 at 53-54, 124. Instead of paying MK, Leroy promised to

---

[3] There is also pending an important matter of current defense counsel's violation of a previously issued No Contact Order, wherein he interviewed MK while he was imprisoned on another unrelated matter.  Motion practices related to this violation covers Doc. Nos. 254 through Doc. No. 271, with a Memorandum Order on March 13, 2023 granting the Motion to Enforce the No Contact Order and Ordering further affidavits regarding the Sanctions for said Violations.  Doc. No. 263.  That matter is neither addressed nor relied upon in this Memorandum Opinion and instead will be resolved by a forthcoming Memorandum Order by this Court.

[4] While the Government references the first full first name of the Minor Victims in its filings, the Court will refer to the Minor Victims by initials only throughout this Memorandum Opinion, and for ease of reading, will not continue to bracket said references in the factual background section of this Opinion.

deposit his wages into a bank account that the boy could access when he turned sixteen, a plan that satisfied Dan K. and Amanda K., the boy's father and stepmother, respectively. Id. at 54, 115, 127, 137-38.

MK's employment at JIMI was conceived by Dan K., who then worked at JIMI. Id. at 54, 120. While MK was "a very good kid," his father, Dan K. apprenticed him at JIMI because the boy associated with the "wrong crowd," although up to that point MK's mischief was confined to smoking cigarettes with other teenagers. Id. at 120-21, 164. Dan K. had firsthand experience with bad choices: his own career at JIMI had been sporadic because he was a heroin, cocaine, and pill addict who was in and out of jail. Id. at 54-55, 122-23.

Although Leroy and his wife Kim Leroy were childless, Leroy had stocked his rural Penn Township home with several dirt bikes, video games, and a hot tub. Doc. No. 205 at 167, 185-86, 190, 203; Doc. No. 206 at 55. Leroy invited boys from JIMI--including MK--over to his house to enjoy all of these diversions. Doc. No. 205 at 195; Doc. No. 206 at 55-58, 132.

**MK moves in with Leroy, who swears MK to secrecy**

Leroy took particular interest in MK, teaching the boy how to ride dirt bikes and drive cars. Doc. No. 206 at 56, 69. Leroy even took MK to Florida in mid-2014. Id. at 129-30.

In October 2014, however, Dan K. was again in the midst of more troubles with the law and MK could no longer live with him so, at Leroy's urging, Dan K. permitted his son to move in with Leroy. Id. at 57-58, 122, 129. Shortly thereafter, Leroy and MK were in the hot tub alone when Leroy offered MK lottery tickets to masturbate in his presence, saying, "I bet you can't come." Id. at 58-60. When Leroy persisted, the boy agreed and the two went to a spare bedroom at Leroy's home, where, after Leroy stacked pillows to conceal the scene in case Kim walked in, the boy masturbated while the man looked on. Id. at 59-60. Afterward, Leroy paid off

the "bet" with $200 worth of lottery tickets. Id. at 60-61.

In January 2015, Leroy bought airline tickets, pulled MK out of school, and took the 13-year-old boy on a trip to Texas. Id. at 80, 130. There, Leroy treated MK to a ride in a Lamborghini and let him drive. Id. at 81. When they were alone in their hotel room on that trip, Leroy used his own left hand to masturbate MK.  Id. at 62-63, 82, 117. Once he had finished, Leroy rewarded the boy with cash and warned him: "don't ever tell anybody." Id. at 62, 83.

**MK tells his parents what has been happening with Leroy**

Despite Leroy's warning not to tell anyone, MK contacted his biological mother, Christine, and revealed the sexual abuse upon returning from the Texas trip in January 2015. When Christine relayed these accusations to Dan K., he did not believe MK, stating: "Jim's too much of a good guy for this." Id. at 117. At Dan K.'s insistence, his son continued to live with Leroy. Id. at 162-63.

Unaware that MK had revealed the abuse, Leroy spent the next several months masturbating him in the spare bedroom and on a green couch in the garage. Id. at 62-66. That living situation persisted until MK's grades plummeted and, according to Leroy, he was becoming "defiant." Id. at 129, 163. Leroy urged MK's parents to send him to a parochial school in Missouri, but they refused. Id. at 67, 163.

**Leroy continues to assault MK and takes him on another trip to Florida.**

MK eventually begged Amanda K. to let him live at home with her again--in the interim, Dan. K. had moved in with his own parents--and she permitted the boy to return in May 2015. Doc. No. 206 at 51, 163-64, 169-70. Over the next several months, however, Leroy continued to bring MK over to his house, where he would masturbate the boy. Id. at 63-66. Leroy also continued to take out-of-state trips with MK, including a second trip to

Florida in June 2015. Id. at 69. Beforehand, Leroy bought MK new clothes and $200

sneakers, telling the boy that he "had to look nice." Id. at 75-77. Leroy also purchased the airline

tickets, and he and MK made the trip by themselves. Id. at 74-75, Gov. Tr. Ex. 4.

      Once in Florida, Leroy allowed MK to drive the car he had rented, even though the

boy was unlicensed. Doc. No. 206 at 69, 78-79; Gov. Tr. Ex. 5. Although Leroy did not smoke

or drink at home, he bought cigarettes for MK and the two drank alcohol during that Florida

trip, including beer and cocktails that Leroy bought at the hotel bar. Doc. No. 206 at 70-72, 78.

Although MK felt "buzzed" afterward, Leroy let the boy drive them to their hotel,

where they shared a room with two beds. Id. at 72-73. When the two were alone inside their

hotel room, Leroy directed MK to lie on his back on his bed, where he removed the boy's

clothes, massaged him, and then masturbated him. Id. at 63-64, 73-74. Leroy then gave MK over

$300. Id. at 124.

      Back home from Florida, Leroy continued to shower MK with attention and gifts,

buying him his own dirt bike as well as a $500 PlayStation gaming console. Id. at 56, 64, 112-

114. Leroy also gave MK cash when he masturbated him. Id. at 73-74. By this time, MK

understood that Leroy only gave him money and gifts "because he touched me." Id. at 113.

MK endured the continued masturbation silently and gave the money he received for

submitting to it to Amanda K. so she could buy groceries for him and his siblings. Id. at 140.

Though unaware of the sexual abuse, Amanda K. was suspicious about the large amounts

of cash--$500 to $1,000--that MK had because "[t]here was no way that he could make that

kind of money" at JIMI. Id. at 166-167. When Amanda K. confronted Leroy, he told her "not to

worry about it" and then privately texted MK: "[W]hy do you keep tattling on me?" Id. at

166-168. Leroy later became more circumspect, instructing MK to tell Amanda K. that

expensive gifts he bought the boy were purchased with "rewards off his credit card." Id. at 113.

**Leroy focuses upon MD**

By late 2015, another boy had caught Leroy's eye: MD, who was only 10 years-old and had no father living at home. Doc. No. 205 at 178-81. MD met Leroy through two of his uncles who worked at JIMI. Id. at 180. Leroy picked up MD in his van, brought him to JIMI for eight-hour shifts removing valve stems from tires on Saturdays, and paid him $40 cash at day's end. Id. at 181-83. MD spent his earnings on childish pursuits, buying chips, drinks, and hockey sticks. Id. at 183.

The defendant ingratiated himself with MD--who, like MK, hailed from a chaotic home-- by bringing him into the Leroy home for extended visits. Id. at 178-79. Leroy also introduced MD to dirt biking. Id. at 185-86. MD was too small to ride his own dirt bike, so he sat in front of Leroy on the bike that the man rode. Id. at 186-88, 198.  MK accompanied them on his own dirt bike. Id. at 188. Eventually, Leroy bought a smaller dirt bike for MD Id. at 189.

Several times after riding dirt bikes, Leroy took MD and MK into his hot tub, all three were in boxer shorts, not bathing suits. Id. at 189-90. But occasionally Leroy also brought MD into the hot tub alone: and on one such occasion, he forcibly removed the boy's boxers and tossed them from the tub, although "it took [Leroy] a couple of times to get ahold of" the child. Id. at 190-92, 201-03. MD became "uncomfortable," so he exited the tub, "guarded" his privates, retrieved his shorts, and dressed. Id. at 192-93.

**Leroy starts to drug MK and MD**

On another occasion, Leroy brought MD and MK to his house for a sleepover in the spare room where MK had stayed previously. Doc. No. 205 at 194-196. At bedtime, Leroy forced the boys to take ZzzQuil--a sleep-aid--because he said "[i]t will make you go to bed quicker." Id. at 196-97. When MD objected, Leroy claimed that he wanted the boys asleep so they could wake up early for church. Id. at 197. Leroy gave MD most of an adult dose, and he gave MK a double dose. Id. at 197-98. MD quickly became drowsy, but before drifting off he recalled Leroy massaging his back, legs, and feet. Id. at 198-200.

In December 2015, Leroy took four boys--MK, MD, and two other preadolescent boys-- to Oglebay, a resort in West Virginia. Id. at 178, 205-06. Leroy rented a car, which he let MK drive partway. Doc. No. 206 at 105. At Oglebay, the boys swam and visited the zoo. Doc. No. 205 at 206. Leroy rented a hotel room for the five of them and "wrestled" with the boys there. Id. at 207. During this wrestling, and throughout the trip, Leroy deliberately and persistently flicked MD's and the younger boys' private parts. Id. at 207-08. MK observed this behavior, which Leroy called "ball-tapping." Doc. No. 205 at 207, Doc. No. 206 at 106.

**On a trip to Michigan, Leroy drugs MK and MD**

In February 2016, Leroy organized another out-of-state road trip; only this time, he used his work van to take MK and MD to Michigan. Doc. No. 205 at 209-10. Although Leroy had a trailer attached to his van, he permitted the then-14-year-old MK to drive for part of that trip, while MD sat on a cooler between the two front seats. Doc. No. 205 at 210-11, Doc. No. 206 at 99.

In Michigan, Leroy left the boys at an indoor waterpark while he booked a hotel room. Doc. No. 205 at 211; Gov. Tr. Ex. 3D. Leroy also bought paper plates, cups, and

sandwiches for a picnic at the hotel. Doc. No. 205 at 211-12: 222, Doc. No. 206 at 87, 99-100,

134; Gov. Tr. Ex. 2, Gov. Tr. Ex. 17.

The hotel room contained two beds and a rollaway bed for MD.  Doc. No. 205 at 217-18,

Gov. Tr. Ex. 2. As MD took a bite of his sandwich, he complained that "[i]t didn't taste right and

it tasted funny." Doc. No. 205 at 212. Leroy laughed and "said the lettuce was probably bad."

Doc. No. 205 at 213, Doc. No. 206 at 87. Leroy then sent MD out of the room on an errand but

told MK to remain behind because, Leroy said, he "had to talk with him" privately. Doc. No. 205

at 213-14.

Once they were alone in the hotel room, Leroy told MK that he had drugged MD's

sandwich. Doc. No. 206 at 93. Then, Leroy handed MK multiple pills--which the boy

recognized to be Vicodin, Percocet, or Valium from his time living with the drug-addicted Dan.

K.-- and told him to take them. Id. at 108, 122-23, 126. Leroy also emphasized to MK that

"we would need to get MD to drink," and explained that the alcohol they were about to

drink would "double the effect" of the pills MK had just swallowed. Id. at 89, 108-09.

MK then left the hotel room, found MD outside, and took him to the van. Doc.

No. 205 at 215. There, MK smoked cigarettes and offered MD alcohol at Leroy's

behest. Doc. No. 205 at 215-16; Doc. No. 206 at 89-92. Per Leroy's instructions, MK told

MD that he had brought the alcohol, when in truth Leroy had bought it. Doc. No. 206 at 90-

91. Because Leroy already had told the boys that he did not mind if they drank, MD accepted the

alcohol, even though he had never had it before. Doc. No. 205 at 216-17.

Eventually, the boys returned to the room, where MD continued drinking in Leroy's

presence; Leroy and MK drank harder liquor. Doc. No. 205 at 216-17; Doc. No. 206 at 90-

91. By the end of the evening, MD--who weighed no more than 60 pounds, Doc. No. 205 at

14

198--had drunk two and a half bottles of hard lemonade. Id. at 215-16. After falling down in a

stupor, MD crawled into his bed and fell asleep. Doc. No. 205 at 217-19; Doc. No. 206 at

92, 100. The next morning, MD woke to find himself in MK's bed, unable to recall how he got

there. Doc. No. 205 at 218: Doc. No. 206 at 100. Unbeknownst to MD, MK had been "scared"

that Leroy would "try to touch" the younger boy, so he protected MD by

feigning sleep and lying awake all night. Doc. No. 206 at 97.

The next day, Leroy found and rented a different hotel room. Id. at 97-98. For dinner,

Leroy bought the boys a pizza, crushed a pill onto a slice, and attempted to feed MD the

drugged slice. Id. at 94. MK saw this and "was scared for what was going to happen to little

MD" if he ate the drugged slice, so he surreptitiously swapped it for an uncontaminated piece.

Id. at 94-95. That evening, Leroy massaged MD and, after that boy fell asleep, crept over to

MK's bed and masturbated him. Doc. No. 205 at 219, Doc. No. 206 at 97-98.

Back at home, MK was behaving oddly and when Amanda K. confronted him, he

revealed that Leroy had drugged him on the trip. Doc. No. 206 at 141-42, 168-69. Amanda K.

contacted Leroy and insisted that MK be drug-tested. Id. at 110, 141, 168-69. Leroy paid for

the test and privately assured MK that, if the boy tested positive for drugs, he would falsify

the results so that Leroy "didn't get in trouble." Id. at 127-28, 142-43. Amanda K. met Leroy at

the lab, where she was shown (but not given) a document reflecting that MK had tested

negative for drugs. Id. at 127, 142.

Later in February, Leroy opened a bank account for MK in the boy's name, as he had

promised to do when JIMI hired the boy nearly twenty months earlier. Doc. No. 206 at 115, 137-

38; Gov. Tr. Ex. 31B. Upon opening the bank account belatedly, Leroy funded it with a deposit

of over $1,850, and he deposited another $90 the following month. Id. Thereafter, Leroy never

deposited any more money into the account. Id.

**Amanda K. believes MK, which triggers an investigation of Leroy**

MK "didn't feel right" after the Michigan trip, and he realized that what Leroy had done was wrong. Doc. No. 206 at 116-17. As part of MK's soul-searching during the days that followed, he began texting Amanda K. "stuff about God." Id. at 171. This struck Amanda K.--who had known MK since he was 6 years-old, Doc. No. 206 at 161--as uncharacteristic behavior, so she pressed him for answers: prompting MK to insist that, despite the results of the drug test, Leroy had drugged him during the Michigan trip. Id. at 170-71.

Upon hearing these allegations, Amanda K. and Dan K. took MK to see a counselor, where the boy explained how Leroy had drugged him and MD with ZzzQuil, alcohol, and pills when they were alone with the man. Doc. No. 205 at 160; Doc. No. 206 at 171-72. The counselor documented and relayed MK's allegations in a ChildLine report, which the Butler County Children and Youth Services ("CYS") received. Doc. No. 205 at 159: Doc. No. 206 at 189.

In March, CYS began its investigation into the allegations by conducting a home visit with MK.  Doc. No. 205 at 159-60. MK repeated his allegations that Leroy had given him and MD drugs and alcohol and revealed Leroy's sexual abuse. Id. at 160-61. MK revealed the sexual abuse because he "didn't want [. . .] what happened to me, [to] happen to MD."  Doc. No. 206 at 116-17.

On March 8, 2016, Sergeant Cheryl Cranmer of the Penn Township Police Department received the written ChildLine report for MK and, during a telephone call with CYS, learned of the sexual abuse allegations that MK had made during the home visit. Doc. No. 205 at 155-56, 159-161. Forensic interviews of both boys were conducted; MK arrived for the interview with

Christine and Dan K. (the latter seeming "high"); and MD arrived with his mother (who seemed "overwhelmed"). Id. at 161-65.

After the interviews, Sergeant Cranmer contacted Detective John Hertzog of the Butler County District Attorney's Office; ultimately, the two alerted the Federal Bureau of Investigations, and Special Agent Thomas Carter became the lead investigator. Doc. No. 205 at 165-66; Doc. No. 206 at 194, 232-33. The investigation was delicate because, although Leroy was unaware that anyone had contacted law enforcement or that MK had revealed the sexual abuse, through some snafu CYS had informed him of MK's drug-and alcohol-related allegations "at the outset." Doc. No. 205 at 161; Doc. No. 206 at 174-75, 234.

Because Leroy had been willing to talk to Amanda K. in the past, the FBI Special Agent Carter asked her to discuss the case with him. Doc. No. 206 at 234-37. "[W]ant[ing] to get his side of the story," Amanda K. agreed. Id. at 182, 235-36. After Amanda K. arranged a meeting with Leroy, Carter outfitted her with a recording device and directed her to try to prompt Leroy "to admit what had happened" and, without mentioning money, to see what "Leroy would agree to do to take care of" MK's family. Id. at 235-37. Carter reminded Amanda K. that "she is the stepmother of MK," and to ask Leroy: "What are you going to do for me?" Id. at 237.

At the agreed-upon time in May 2016, Leroy sat with Amanda K. at a Burger King restaurant while Carter sat in plainclothes a few tables away. Id. at 174, 236. This meeting was unproductive because, when Amanda K. asked him whether he had drugged MK, Leroy made no admissions. Id. at 177. Upon hearing Amanda K. complain that she was "struggling with [her] bills," Leroy offered to pay her rent and to reinstate MK at JIMI, provided she restored his access to the boy and "did not go to authorities." Id. at 174-176, 180. No money changed hands after the meeting, however. Id. at 176, 180.

**MS refuses to discredit MK**

A few months later, an 18-year-old named MS informed authorities about Leroy.  Doc. No. 206 at 208-17. MS explained that he had known Leroy for years through Brandon F., who worked for JIMI. Id. at 200.  According to MS, Brandon F. approached him in the summer of 2016 and offered him $200 for each video he produced of MK using drugs; the plan was to create evidence to "discredit" the boy's allegations that Leroy had drugged him by showing that MK "was out there doing drugs by himself, willingly." Id. at 209.

Shortly thereafter, MS met Leroy at JIMI. Id.at 211.  Leroy asked whether MS had taken "care of the problem" by capturing MK using drugs on film. Upon hearing that MS had not yet done so and that he was considering quitting smoking pot, Leroy responded that "it wasn't a good time to stop" until "the situation was dealt with," and exhorted MS "to kick it up and turn it up." Id. at 211-13.   Accordingly, MS contacted MK and persuaded the younger boy to join him on several occasions in using marijuana and cocaine that Brandon F. had procured. Id. at 111, 213-17. MS created videos of these encounters and sold them to Brandon F. Id. at 213, 216, 226.

When MS later learned that MK had accused Leroy of masturbating him as well as drugging him; however, he felt "like a piece of s**t" for what he had done and decided to "come clean" about his role in the plot to discredit the boy.  Doc. No. 206 at 217. Unbeknownst to anyone except his own mother, who had never told authorities, MS also had endured unwanted sexual contact from Leroy years before. Id. at 201-07.  MS's story paralleled that of MD.  Doc. No. 205 at 190-194. Specifically, when MS was twelve years-old, he and a boy named Donovan O. were with Leroy in his hot tub when the boys began roughhousing. Doc. No. 206 at 201-203. Leroy joined in, "pulling [MS's] boxers down." Id. at 202-03. MS resisted, but Leroy "was a full-grown man" so he eventually removed the boy's boxers and tossed them from

the tub. Id.  Breathing heavily, Leroy pinned MS from behind and fondled his testicles. Id. at 204-05. Although this incident struck MS as "weird," he retrieved his boxers, put them back on, and got back into the tub because he was worried about leaving Donovan O. alone with Leroy. Id. at 205-06.

In October 2016, Leroy sent the cellphone that he had used for years to a forensics firm with instructions to recover all incoming text messages from January and February 2016, including all text messages from Dan K. in 2016.  Gov. Tr. Ex. 12B. Leroy paid $500 for this service and authorized technicians to "ruin[] the phone" if necessary.  Gov. Tr. Ex. 12B; Gov. Tr. Ex. 5. But on the written form he completed, Leroy claimed that he was "not sure" why he wanted these text messages. Gov. Tr. Ex. 12B.

In November 2016, Special Agent Carter and Detective Hertzog executed search warrants at Leroy's home and at JIMI. Doc. No. 206 at 194-96, 239. There, they found a bottle of ZzzQuil, a shopping list with the word "ZQuill" in Leroy's distinctive handwriting, and other over-the counter and prescription medications. Doc. No. 206 at 258-59; Gov. Tr. Ex. 7; Gov. Tr. Ex. 15D; Gov. Tr. Ex. 15G. Carter and Hertzog also found Leroy's cellphone. Gov. Tr. Ex. 14G; Gov. Tr. Ex. 15J. Finally, they found the PlayStation in the bedroom where MK and MD stayed, and they gathered evidence corroborating other details of the boys' accounts, including photographs of the hot tub, the dirt bikes, and the green couch in the garage. Gov. Tr. Ex. 15F; Gov. Tr. Ex. H; Gov. Tr. Ex. 15K; Gov. Tr. Ex. 15L. At JIMI, investigators found E-Z-Pass records, receipts, and cellphone, bank, and airline records corroborating the boys' accounts of the trips, including dates and destinations.

Doc. No. 206 at 239-262.

## IV.  Standard of Review

Title 28 U.S.C. Section 2255 provides, in relevant part:

> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.  If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

Whether to conduct a hearing is within the sound discretion of the District Court. *United States v. Lilly,* 536 F.3d 190, 195 (3d Cir. 2008); *United States v. Day,* 969 F.2d 39, 41 (3d Cir. 1992)(quoting *Government of the Virgin Islands v. Forte,* 865 F.2d 59, 62 (3d Cir.1989), *cert. denied* 500 U.S. 954 (1991)).  In exercising that discretion, "the [C]ourt must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record.  Further, the Court must order an evidentiary hearing to determine the facts unless the motion and files and records of the case show conclusively that the movant is not entitled to relief." *Day,* 969 F.2d at 41-42 (citation omitted). *See also* Rules Governing Section 2255 Proceedings, Rules 4 and 8.  The Court must view the factual allegations in the light most favorable to the Petitioner. *Government of the Virgin Islands v. Weatherwax,* 20 F.3d 572, 574 (3d Cir. 1994) (district court erred in failing to conduct evidentiary hearing on Petitioner's non-frivolous allegations of ineffective assistance of counsel) (subsequent history omitted). However, a Section 2255 Motion may be dismissed without a hearing if: (1) its allegations, accepted as true, would not entitle Petitioner to relief, or (2) the allegations cannot be accepted

as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.  *United States v. McCoy*, 410 F.3d 124, 134 (3d Cir. 2005) (citations omitted).

In order for Petitioner to establish counsel was ineffective, he has the burden to show counsel's performance (i) was in fact deficient and (ii) that the deficient performance so prejudiced the defense as to raise doubt to the accuracy of the outcome of the trial [or the sentence]; *i.e.*, Petitioner must demonstrate a reasonable probability that, but for counsel's deficiency, the outcome of the trial [or sentence] would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 692 (1984).

Counsel's conduct presumptively "falls within the wide range of reasonable professional assistance," and the Petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Id.* at 689-90 (citation omitted).  On the other hand, the mere fact that counsel's challenged performance or tactic can be called "strategic" in the sense it was deliberate, does not answer the dispositive question of whether that decision or tactic fell within the wide range of "reasonable professional assistance." *Davidson v. United States*, 951 F.Supp. 555, 558 (W.D.Pa. 1996), *quoting Government of the Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1431-32 (3d Cir.), *cert. denied* 117 S.Ct. 538 (1996).  "Reasonable trial strategy must, by definition, be reasonable." *Davidson*, 951 F.Supp. at 558.

Counsel's strategy must be judged by a standard of reasonableness based on the prevailing norms of the legal profession. *Berryman v. Morton*, 100 F.3d 1089, 1094 (3d Cir. 1996) (*Strickland* standards for claims of ineffective assistance of counsel unchanged under Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-132, 110 Stat. 1214).

Ineffective assistance of counsel will not be found simply because, with the assistance of hindsight, the reviewing court disagrees with counsel's strategy. *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997).

In the context of a Section 2255 petition for collateral relief, the Court of Appeals for the Third Circuit has offered the following guidance:

> The . . . test for determining whether a hearing should be held on an ineffectiveness claim is slightly altered by the *Strickland* holding. Our analysis of allegations of ineffectiveness of counsel breaks down into two parts. First, we must determine whether the district court considered as true all of appellant's nonfrivolous factual claims. This step requires that we review whether the district court properly found certain allegations frivolous. Second, we must determine whether, on the existing record, those claims that are nonfrivolous conclusively fail to show ineffective assistance of counsel. To evaluate claims under this second step, we must turn to both prongs of the *Strickland* test. If a nonfrivolous claim clearly fails to demonstrate either deficiency of counsel's performance or prejudice to the defendant, then the claim does not merit a hearing. If, on the other hand, a claim, when taken as true and evaluated in light of the existing record, states a colorable claim for relief under *Strickland*, then further factual development in the form of a hearing is required. That is, if a nonfrivolous claim does not conclusively fail either prong of the *Strickland* test, then a hearing must be held. Thus, the district court must employ the *Strickland* analysis at least once, and may have to employ it twice--first, as a threshold analysis of all claims on a limited record, and then again only on colorable claims after full factual development of those claims.

*United States v. Dawson*, 857 F.2d 923, 927-28 (3d Cir. 1988).

Under the first prong of the *Strickland* test, "an attorney renders ineffective assistance when his performance 'f[alls] below an objection standard of reasonableness,' given the particular circumstances of the case at hand." *Hodge v. U.S.*, 554 F.3d 372, 379 (3d Cir. 2009)(*quoting Strickland*, 466 U.S. at 688)). As in any other ineffective assistance of counsel context, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The Court must employ a highly deferential standard, which entails "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *United States v. Hankerson*, 496 F.3d 303, 310 (3d Cir. 2007)(quoting *Strickland*, 466 U.S. at 689).  To rebut this presumption, a Petitioner "must show either that: (1) the suggested strategy (even if sound) was not in fact motivating counsel, or (2) that the actions could never be considered part of a sound strategy."  *Thomas v. Varner*, 428 F.3d 491, 499 (3d Cir. 2005).

Under the second prong (i.e., the prejudice prong), Petitioner must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  "A reasonable probability is a 'probability sufficient to undermine confidence in the outcome.'"  *Hankerson*, 496 F.3d at 310 (quoting *Strickland*, 466 U.S. at 694).

The District Court may consider Defendant's claims "as supplemented by the trial judge's personal knowledge," *Gov't of Virgin Islands v. Nicholas*, 759 F.2d 1073, 1075 (3d Cir. 1985), because the judge who presided over the trial "is uniquely familiar with the overall circumstances of the original case." *United States v. Travillion*, 759 F.3d 281, 288 (3d Cir. 2014).

## V.   Discussion

### A.  Summary of Claims

In Defendant's Amended Motion to Vacate, filed on June 23, 2021, he claims that trial counsel was ineffective:

(1) for not impeaching MK and MD with their prior inconsistent statements.

(2) for not interviewing and presenting Luke Durci, whose trial testimony would have significantly impeached if not "destroyed" MK and MD's narratives regarding the Michigan trip.

(3) for not conducting an adequate investigation developing and presenting readily available impeachment and exculpatory witnesses (Gary Koval, Keither Starr, Billy Stuteville, Tim Butler, Nikki Matthews, Brandon F. and Eddie Robinson) that MK's motives were not motivated by Defendant firing his father, but instead, he conspired with MS and others to falsely accuse Defendant of sexual misconduct to seek revenge and money from Defendant.

(4) for not adequately investigating the accusations against Defendant and developing and presenting witnesses who would have testified that MK and MS had reputations for dishonesty.

(5) for failing to contest the Government's *Motion in Limine* that character evidence was inadmissible and for failing to request a proffer because he did not adequately investigate Defendant's background and character.

(6) for failing to properly advise Defendant about not testifying because the investigation preceding this advice was objectively unreasonable. Doc. No. 225.

In Defendant's Supplemental Amended 2255 Petition, filed on March 8, 2022, after the filing of trial counsel's Court-Ordered Affidavit (Doc. No. 238-1), although not identified as a new claim, he essentially advances an additional claim of ineffectiveness (addressed herein in a Discussion subsection under claim one), contending that trial counsel failed to request a continuance of the trial, thus "conceding his own ineffectiveness because trial management decisions are left solely to trial counsel." Doc. No. 241 at 12.

Defendant's Supplemental Amended 2255 Petition also uses the Affidavit of trial counsel as a basis to make further arguments that his trial counsel's alleged deficient performance

violated his right to effective representation of counsel.  Defendant postulates that trial counsel's

Affidavit confirms ineffective representation:

> (1) in failing to review, identify, and chart inconsistencies in MK and MD's statements as
>
> set forth in Claim One.
>
> (2) in submitting incredible and unsupported contentions regarding Luke Durci's
>
> testimony as set forth in Claim Two.
>
> (3) in submitting incredible and unsupported contentions regarding why he did not
>
> interview or investigate defense witnesses in Claim Three.
>
> (4) in "wrongly" understanding impeachment case law as set forth in Claim Four; and,
>
> (5) in submitting vague, unsupported, and incredible contentions regarding Claims Five
>
> and Six.

Doc. No. 241.

### B. Analysis of Claims

### (1) Trial counsel was not ineffective for strategically deciding that it was not effective to impeach the minor child victims, MK and MD, with their alleged prior inconsistent statements.

Defendant first contends that trial counsel was ineffective for failing to impeach what he

describes as "substantial" "internally" and "externally inconsistent" statements by both MK and

MD.  In support, Defendant hypothesizes that any reasonably competent attorney would have

politely approached these child victim witnesses and questioned them about the numerous

alleged inconsistencies, including those that were identified in their January 24, 2017, discovery

production, just six days before trial.

Included in that discovery production were the following statements: (1) MD's March 9,

2016 handwritten statement; (2) the transcripts of MD's March 17, 2016 forensic interview;

(3) MD's August 3, 2016 forensic interview; (4) Sgt. Cramner's Penn Township Police Report; (5) the summaries of the Childline reports made by the family of MK on March 1, 2016, and March 8, 2016; (6) MK's March 17, 2016, forensic interview; (7) MK's June 23, 2016, FBI statement; and (8) MK's January 23, 2017 FBI statement.

According to Defendant, "[t]here's no way on God's green Earth trial counsel had the time to read, digest, chronical, and comprehend the narratives weaved throughout MD's and MK's statements and forensic interviews and to identify the above-mentioned inconsistencies." Doc. 225 at 104.

Defendant speculates that had trial counsel spent the time to review and consider these inconsistencies, all he needed to do was ask simple fact-based questions regarding each inconsistency and the cumulative impact of these inconsistencies would have "seriously impair[ed]," and "potentially destroy[ed]" MK and MD's credibility.  Defendant attaches three (3) charts detailing these supposedly credibility destroying inconsistencies of MK and MD and groups them as inconsistencies within each witnesses' own prior statements and then inconsistencies between the testimonial narratives of MK and MD.  Defendant thereafter devotes 18 pages of his 182 page Amended Motion to Vacate detailing the alleged inconsistencies, outlining 11 separate points of MD's alleged internal inconsistencies, 18 separate points of MK's alleged internal inconsistencies, and 7 distinct points of alleged external inconsistencies between MK and MD's testimony.  Doc. No. 221 and Doc. No. 225.

The Court will not recount the substance of those alleged contradictions in this Memorandum Opinion but it has reviewed and considered each alleged inconsistency raised by Defendant.  The Court also recognizes that Defendant maintains that the cumulative effect of these many discrepancies, had any or all of them been revealed to the jury through effective

cross-examination, would have undermined the outcome of the trial and therefore, meets the *Strickland* standard of prejudice.

The Government disagrees and states the alleged inconsistencies were merely tangential or immaterial to the minor victims' compelling and consistent testimony about Defendant's sexual offending, and the out-of-state trips. On the basis of the Court's recollection of the trial testimony, as well as a review of the trial record in this case, the Court maintains that the evidence of the criminal conduct alleged was "overwhelming" and these alleged inconsistencies, even taken cumulatively, do not undermine this Court's confidence in the outcome of the trial. *Travillion*, 759 F.3d at 288; Doc. No. 247 at 18-19.[5]

### Defendant cannot show prejudice under *Strickland*

This Court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. As the Supreme Court has noted, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id*. Here, Defendant has not shown that trial counsel's alleged errors in not impeaching MK and MD with their alleged prior inconsistent statements prejudiced him, and therefore, his claim in this regard necessarily fails as a matter of law, without the need for a hearing.

### Trial counsel's conduct was reasonable under *Strickland*

Under *Strickland, t*he Court is not required to consider the Affidavit of trial counsel, because the reasonableness of trial strategy need not be addressed unless prejudice is

---

[5] See Section 7 of the Discussion (V) portion of this Memorandum Opinion addressing Defendant's allegations of cumulative prejudicial impact.

demonstrated.  Nonetheless, the Court notes that in trial counsel's Affidavit response to Defendant's claim of error by choosing not to impeach MK and MD regarding minor inconsistencies, trial counsel explains that his cross-examination strategy was deliberate, as he declares: "It was part of my trial strategy not to address any inconsistencies in the statements of MK and MD." Doc. No. 238-1 at 2.

Further, trial counsel offers justifications in support of his strategy, including his professional judgment that "it served no purpose to dwell on inconsistencies that were not material to the abuse," and that focusing on immaterial inconsistencies would only reinforce expert testimony. Doc. No. 238-1 at 2. Trial counsel explains that from his experience, "after a jury hears from an expert witness on how statements are obtained and forensic interviews are conducted with alleged sex assault victims, it is difficult to impeach a witness by focusing on inconsistencies that are not material to the claims of abuse, or by relying on statements that are incomplete. This is due to the fact that the expert witness informs the jury that it is consistent with behavior of children who are the victims of abuse either to fail to disclose the abuse timely, or for the children to remember more details over time." Id.

Based on trial counsel's considerable experience, he concludes that "[c]onsequently, there is no benefit to the defendant to keep the alleged child victim on the stand testifying by grilling them on these minor inconsistencies. The detriment to the defendant is that the Jury will observe the child victim for a longer period of time and may, perhaps, develop empathy." Id.

Additionally, contrary to Defendant's contentions, the Court recalls that trial counsel did in fact carefully cross-examine MK, including eliciting testimony about conflicting prior

statements on the timing and frequency of Defendant's alleged abuse.[6]  Doc. No. 206 at 118-139.
A review of the trial transcript reminds this Court that following trial counsel's statements to this
Court that he required about 30 minutes to cross examine MD, he instead chose to ask MD the
pointed question of whether, during the trip to Michigan with Defendant, they stopped
somewhere on the way home and whether the purpose was to pick up tires and springs at that
location. Doc. Nos. 205 at 227; 206 at 48-49.   Moreover, trial counsel argued vigorously in
closing that credibility was central, that MK and MD should not be believed, and referenced the
Court's instruction regarding "false in one, false in all." Doc. No. 207 at 24-41.

Under the first prong of *Strickland*, Defendant must show that 'counsel's representation
fell below an objective standard of reasonableness' under 'prevailing professional norms.'"
*Collins v. Secretary, Pennsylvania Dep't of Corrections*, 742 F.3d 528, 546 (3d Cir. 2014)
(*quoting Strickland,* 466 U.S. at 688). Under the *Strickland* standard of review, the Court notes
that even Defendant does not dispute that trial counsel made a "strategic choice" not to cross-
examine MK and MD on what trial counsel and the Government describe as tangential or
immaterial inconsistencies.

In light of the above, this Court does not agree with Defendant that his trial counsel's
strategic decision not to cross-examine MK and MD about inconsistencies in their testimony fell

---

[6] The Court views trial counsel's overall defense strategy of holding the Government to its
burden, as reasonable.  In keeping with that strategy, trial counsel's tactical decision to limit the
cross examination of MD is supportive of his reasonable defense strategy. Doc. No. 238-1.  Trial
counsel did conduct extensive cross examination of MK and MS, and reasonably tactically chose
to limit his questioning to one alleged inconsistency with MD, who was the youngest of the
witnesses.  There is a distinction between a decision not to conduct a more aggressive cross
examination of a child victim witness, and a decision to conduct no cross examination of a child
victim witness, at all.

below an objectively reasonable standard of professional judgment.  See Doc. No. 238-1 at 2-3.

Thus, Defendant's first claim fails as a matter of law.

**There is no presumption of prejudice from an alleged deficient failure to obtain a continuance.**

In a subpart of claim one, which was pointedly raised for the first time in Defendant's

Supplemental Amended Motion to Vacate, Defendant expands on the contention that trial

counsel was ineffective in investigating, reviewing, identifying, and charting the alleged

inconsistencies in the statements/testimony of MK and MD, by claiming that trial counsel's

Affidavit reveals that he was ineffective for failing to request of the trial continuance, because he

admitted that he did not have time to adequately prepare his defense. Doc. No. 241 at 16-31.

This argument is a central point of contention in Defendant's Supplemental Amended Motion,

after the filing of the trial counsel's Affidavit.  Doc. No. 241 at 16.  Defendant attempts to

convince this Court that trial counsel's decision not to seek a continuance for trial preparation

constitutes plain evidence of prejudice, and that trial counsel "conceded his own ineffectiveness

because trial management decisions are left solely to trial counsel – not the defendant."  Doc.

No. 241 at 16.

As the Government emphasizes, and this Court agrees, prejudice is not presumed from an

allegedly deficient failure to obtain a continuance. Here, trial counsel was not deficient in not

requesting more time for trial preparation, but more importantly, Defendant has not shown

prejudice from that alleged error.  Doc. No. 247 at 23.-24.

The United States Court of Appeals for the Third Circuit has explained, "[i]t is a high bar

to claim ineffectiveness from failing to seek a continuance or lack of time to prepare." *Simon v.

Gov't of Virgin Islands*, 929 F.3d 118 (3d Cir. 2019). "A short window of time to prepare is not a

reason to presume ineffectiveness; counsel is ineffective only if the time frame affected the

adversarial process."  Here, Defendant has failed show what specific error or errors resulted from trial counsel's failure to request a continuance.

The Court recalls from the pre-trial proceedings that Defendant insisted that his trial counsel not file pretrial motions, that his case go to trial on January, 30, 2017, and declined the Court's offer of March 6, 2017.  Doc. No. 195 (as explained more fully in the Procedural History (Section II) in this Memorandum Opinion).  Yet, now, Defendant attacks his trial counsel, for proceeding in the manner that Defendant himself requested. Simply stated, Defendant cannot have it both ways, and he has not shown either deficient performance or prejudice in this regard.

    **(2)  Trial counsel was not ineffective for deciding not to interview and present the testimony of Luke Durci, in an attempt to undermine the credibility of MK and MD's testimony regarding the Michigan trip.**

Defendant's second argument for ineffective representation by trial counsel is that Luke Durci, an alleged "impeachment" witness and former driver for Defendant's business (JIMI), whose unsworn statement was obtained by Defendant's private investigator in 2020, should have been called as a witness, and that trial counsel's failure to interview and call Mr. Durci was not reasonable and prejudiced him.  Doc. No. 221-1 at 25-28.

    **Defendant cannot show prejudice under *Strickland***

Most crucially, Defendant's claim in this regard falters at the outset because he cannot show that he was prejudiced by trial counsel's decision not to call Mr. Durci in that there is a  not reasonable or substantial likelihood that had he called Mr. Durci as a witness, the trial would likely or even possibly have had a different result.  Therefore, the inquiry could end there.

    **Trial counsel's conduct was reasonable under *Strickland***

Moreover, crediting Mr. Durci's reported statement as true, trial counsel reasonably could have relied on Defendant's statements and Mr. Durci's interview with a prior attorney to

conclude that Mr. Durci was not necessary or relevant to establish that the Michigan trip had a business purpose. Doc. No. 238-1 at 4. Further, had Mr. Durci testified consistently with the unsworn statements in the defense investigator's 2020 summary (see Doc. No. 221-1 at 25-28), his testimony likely would not have contradicted MK and MD's description of Defendant's actions at their hotel on the Michigan trip because Mr. Durci stayed at a different hotel. Doc. No. 221-1 at 26. In any event, hotel records and other receipts from Michigan on the afternoon of February 14, 2016, which are part of the trial record in this case, completely undermine Mr. Durci's claims that Defendant was in Indiana during that time. Govt. Tr. Ex. 3a, 10, 17.

Defendant speculates that Mr. Durci's testimony would have destroyed the credibility of MK and MD that they did not drink Mike's Hard Lemonade in the hotel room with Defendant during the Michigan trip, but instead did so on their own, and they were passed out drunk by the time Mr. Durci and Defendant returned to the room. Defendant then claims had Mr. Durci testified, he would have been entitled to a "false in one false in all" instruction, which permits the jury to disregard all or part of a witness's testimony if the witness has testified falsely about "a material fact." Doc. No. 225 at 139 (*citing Lambert v. Blackwell*, 387 F.3d 210, 256 (3d Cir. 2004)).

Having heard and viewed the totality of the testimony in this case, those alleged facts would not have been "material" falsities, and could easily be explained as innocent mis-recollections by MK and MD. Moreover, what Defendant neglects to mention is that this Court actually did so advise the jury in its final instructions as it provided a "false in one, false in all" final jury instruction. Doc. No. 92 at 12.

Thus, the Court finds that trial counsel's strategic decisions not to call Mr. Durci was reasonable under the prevailing norms of the profession.

**(3)  Trial counsel was not ineffective for conducting an inadequate investigation, and deciding not to present supposed impeachment and exculpatory witnesses (Gary Koval, Keither Starr, Billy Stuteville, Tim Butler, Nikki Matthews, Brandon F. and Eddie Robinson).**

In Defendant's third argument supporting his claim of ineffective representation, he presents a long line of allegedly "readily available impeachment and exculpatory witnesses," whom he claims would have shown that the true motivation of MK was to conspire with MS to falsely accuse Defendant of sexual misconduct and to seek revenge and money from Defendant. Defendant posits that trial counsel did not discharge his duty to conduct a reasonable investigation of these supposed impeachment and exculpatory witnesses, which resulted in a prejudicial violation of trial counsel's duty to provide effective representation. Doc. No. 225 at 141-157.

**Defendant cannot show prejudice under *Strickland***

Again, at the outset, the prejudice prong of *Strickland* has not been met because the proposed testimony of the long line of witnesses, even if admitted into evidence, is too attenuated to demonstrate a reasonable probability that the result of the trial could have been altered.  *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019), *citing Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001)(Defendant's conjecture about what witnesses might have said does not demonstrate prejudice).  Defendant's proposals about the speculative testimony of the following witnesses:  Gary Koval, Keith Starr, Billy Stuteville, Timothy Butler, Nikki Matthews, Brandon F. and Eddie Robinson do not prove prejudice for the reasons set forth below (testimony was cumulative and otherwise inadmissible).

**Trial counsel's investigation was reasonable**

Defendant correctly explains that *Strickland* compels counsel to comply with his or her "duty to bear such skill and knowledge as will render the trial a reliable adversarial testing

33

process." Doc. No. 225 at 107 (*quoting Strickland*, at 688).  Boiled down to its essence, counsel, who acts as advisory and advocate, has a duty to make a "reasonable investigation."  *Strickland,*. at 690.  Defendant explains that "a cursory investigation," does not "automatically justif[y] a tactical decision with respect to [trial] strategy."  *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).  However, in evaluating an alleged failure to investigate claims under *Strickland*, the Court of Appeals for the Third Circuit has stated: "We recognize that '[t]he right to counsel does not require that a criminal defense attorney leave no stone [unturned] and no witness unpursued.'" *Blystone v. Horn*, 664 F.3d 397, 423 (3d Cir. 2011) (*quoting Jermyn v. Horn*, 266 F.3d 257, 308 (3d Cir. 2001)); *Lewis v. Mazurkiewicz*, 915 F.2d 106, 113 (3d Cir. 1990) ("As *Strickland* made clear, trial counsel was not bound by an inflexible constitutional command to interview every possible witness."). *Blystone v. Horn*, 664 F.3d 397, 423 (3d Cir. 2011) (*quoting Jermyn v. Horn*, 266 F.3d 257, 308 (3d Cir. 2001)); *Lewis v. Mazurkiewicz*, 915 F.2d 106, 113 (3d Cir. 1990) ("As *Strickland* made clear, trial counsel was not bound by an inflexible constitutional command to interview every possible witness.").   This Court's "principal concern" is to determine the reasonableness of the investigation supporting the trial strategy.

In order to properly analyze this claim (and any resulting prejudicial impact), an analysis properly turns on the alleged speculative testimony of the following witnesses:  Gary Koval, Keith Starr, Billy Stuteville, Timothy Butler, Nikki Matthews, Brandon F. and Eddie Robinson.

### Mr. Koval and Mr. Starr

Defendant posits that uninvestigated fact witnesses Mr. Koval and Mr. Starr are JIMI employees who could have explained to the jury why Defendant terminated Dan K. (who did not testify at trial); how Dan K's termination angered him and his wife; and, how Dan K. and his wife repeatedly called and confronted Defendant and other managers at JIMI, seeking them to

rehire Dan K.  According to Defendant, he provided trial counsel with handwritten statements by Mr. Starr, from March 30, 2016, regarding Dan K's termination, and trial counsel's decision not to interview and present Mr. Koval and Mr. Starr was "objectively unreasonable," especially because interviewing them would not have hurt Defendant's case, but instead would have "strengthened it significantly."  Doc. No. 225 at 145.

However, importantly, because the purpose of this testimony would have been to expose Dan K. as a dishonest person, it is critical to remember that Dan K. was not a trial witness, and in any event, the jury heard testimony that established that Dan K. was a drug user, that he was fired, and that his son was asked whether the firing of his father affected his testimony at trial, to which he responded "No."  Doc. No. 206 at 147.  Additionally, though not part of the evidence, this Court recalls that trial counsel argued in his closing that Dan K.'s termination created a motive to falsely accuse the Defendant. Doc. No. 206 at 52, 138, 146-47.

The Government counters, and this Court agrees, that not only would Mr. Koval and Mr. Starr's testimony have been cumulative to facts already in evidence, it would also have been hearsay and impeaching of a non-witness (Dan K.), collateral, confusing, and potentially inadmissible under Rule 403 and Rule 608(b). This Court finds that no material fact related to the elements of the offense would be proved or refuted through their testimony.

**Mr. Stuteville, Mr. Butler, Ms. Matthews, Brandon F. and Mr. Robinson**

Defendant further contends that trial counsel did not locate, interview, develop and present numerous other fact witnesses (Mr. Stuteville, Mr. Butler, Ms. Matthews, Brandon F., and Ms. Robinson),[7] who allegedly heard MK and others discussing that they had fabricated their

---

[7] According to Defendant (at Doc. No. 225, at 145-152), among other things, the following witnesses would have testified, as follows.  Mr. Stuteville is the half brother of MS and would have been presented to show that MS was dishonest and that Defendant mentored him with no

allegations against Defendant, which "would have significantly impeached, if not destroyed, these trial claims by MK and MS," and would have been admissible as impeachment evidence under the prior inconsistent statement doctrine. Doc. No. 225 at 154, FN 522 (*citing* Fed. R.Evid. 806); Doc. No. 225 at 155.

Defendant also speculates that testimony by Brandon F. would have refuted MS's statement that Brandon F. threatened him so that he would not testify against Defendant. According to Defendant, this testimony, had it been investigated and presented, would have "significantly impeached, if not destroyed, MS's hot tub narrative." Doc. No. 225 at 155. And, Defendant argues that testimony by Mr. Robinson would have shown that he did not trust MK and his father, and that MK had told Mr. Robinson that "My family can own [Defendant's] business and all I'd have to do is accuse [Defendant] of jacking me off."

As proof of what these witnesses would now allegedly testify to, Defendant provides the Affidavit of a private defense investigator who interviewed these witnesses in July, August and October of 2020, and summarizes their testimony therein. Doc. No. 221-1 at 28-34. Of course, these unsworn summaries do not carry the same weight as trial testimony. More importantly, and central to the issue at hand, they do not refute the documentary evidence that supports the detailed and similar minor victims' testimonial narratives.

---

inappropriate or illegal behavior. Mr. Butler worked for Defendant when he was 12-13 and 17-18 and his testimony allegedly would have demonstrated that Defendant never did anything inappropriate to him and was a mentor to him. Ms. Matthews is the younger sister of MS, and would have testified that MS was a "liar" and that MS, MK, AS and Tammy Clutter (mother of MS) were "money hungry people." Doc. No. 225 at 150. Brandon F. worked for Defendant, and would have denied that he threatened MS or anyone else; and Mr. Robinson owned Robinson's Mobile Homes and was in the presence of MK and warned Defendant about MK's statement to the effect of being able to own the business of Defendant by lodging false accusations against Defendant.

Additionally, the Government responds that it would have moved to exclude such witnesses under Federal Rule of Evidence 403 on the basis that, even if deemed relevant, the probative value would have been substantially outweighed by a danger of confusing the issues, misleading the jury, wasting time, and needlessly presenting cumulative evidence.

Trial counsel was not ineffective for inadequately investigating the accusations against Defendant and developing and presenting witnesses who would have testified that MK and MS had reputations for dishonesty.  To the contrary, MK and MS were subjected to rigorous cross examination and trial counsel urged the jury to discount both witness's testimony as not credible. Defendant's argument in this regard fails.

### (4) Trial counsel was not ineffective for not adequately investigating the accusations against Defendant and developing and presenting witnesses whose testimony would have shown that MK, MD, and MS had reputations for dishonesty.

In Defendant's fourth argument supporting his claim for ineffectiveness of trial counsel, Defendant claims that his trial counsel acted unreasonably by failing to interview, investigate, research and present the testimony of a laundry list of witnesses who allegedly would have shown that MK, MD and MS were not credible.  Defendant raises the above exhaustive list of fact witnesses (Mr. Durci, Mr. Stuteville, Mr. Butler, Ms. Matthew, Brandon F.), plus Joseph Mercurio, John Mercurio, Normal Hillard, David Allen, Roland Hembree, and Mr. and Mrs. Leroy, as supportive of his ability to undermine the credibility of MK, MD and MS.[8]

**Defendant cannot show prejudice under *Strickland***

The individual or cumulative effect of trial counsel's alleged failure to investigate and attempt to call the above witnesses is too tentative to support a showing of prejudice.  Again, the

---

[8] Trial counsel did interview Mr. Hembree and Defendant himself, and his private investigator had scheduled an interview with Mr. Durci, which he decided not to pursue.

prejudice prong of *Strickland* has not been met because the proposed testimony is offset by Defendant's inability to demonstrate a reasonable probability that the result of the trial could have been altered.  *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019), *citing Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001)(Defendant's conjecture about what witnesses might have said does not demonstrate prejudice).

When a Defendant claims that trial counsel is ineffective for failing to call a witness, he or she must make a specific, affirmative showing as to what the missing evidence would have been and prove that this witness's testimony would have produced a different result." *Blount v. United States*, 330 F. Supp. 2d 493, 497 (E.D. Pa. 2004). Thus, Defendant must establish that the witness would have provided helpful or beneficial testimony. *See United States v. Kauffman*, 109 F.3d 186, 190 (3d Cir. 1997).

Again, Defendant declares that had these witnesses testified regarding MK, MD and MS's reputations for dishonesty, there is a reasonable probability that one juror would have had reasonable doubts regarding Defendant's guilt as to Counts One through Four of the Indictment.

This Court disagrees with Defendant and finds that there is no reasonable probability that the result of the trial would have been different, had these witnesses testified.  Far from it, there is no consensus that their testimony would have even been helpful to Defendant, and in fact, it could have had the opposite effect as trial counsel's Affidavit explained, supra. Doc. No. 238-1. Simply stated, Defendant's argument in this regard fails for the same reasons as all the other ineffectiveness arguments fail, as Defendant has failed to demonstrate prejudice.

**Trial counsel's strategy and investigation was reasonable**

The instant claim of ineffectiveness of trial counsel also suffers from the same defects as Defendant's third claim above.  This Court finds that trial counsel's conduct was objectively

reasonable under the prevailing norms of the legal profession, as he was not required to leave no stone unturned in his investigation and research. Trial counsel was not ineffective for inadequately investigating the accusations against Defendant and developing and presenting witnesses who would have testified that MK, MD, and MS were not credible.  To the contrary, MK, and MS were subjected to rigorous cross examination and trial counsel urged the jury to discount both witness's testimony as not credible, and trial counsel acted reasonably in limiting the cross-examination of MD.  Defendant's argument in this regard fails.

**(5) Trial counsel was not ineffective for choosing not to contest the Government's *Motion in Limine* that character evidence was inadmissible, and for failing to request a proffer of evidence of Defendant's background and character.**

In Defendant's fifth argument supporting his belief that he is entitled to a new trial because he was deprived of his constitutional right to effective representation, he theorizes that trial counsel's decision not to contest a Government *Motion in Limine* on the admissibility of character evidence of Defendant, for failing to contest the Government's strategy to "weaponize" or "flip the script" by using multiple character traits against Defendant, and for failing to request a proffer thereon, prejudiced the outcome of his trial.  Doc. No. 221, at 163.  Defendant again claims that his trial counsel's ineffectiveness in this regard stems from his failure to investigate his client's background and character and he devotes over 15 pages of his briefing to this argument.  Doc. No. 221, at 161-76; Doc. No. 241, at 72-73.

Defendant speculates that the following multiple character traits, had they been put forward by trial counsel, would have gone a long way to proving that he was not guilty of the criminal conduct with which he was charged:  (1) he is "a man of God," (2) he does not drink or do drugs; (3) he was forgiving and gave addicts and felons many chances; and (4) for over 30 years he hired and mentored juveniles from troubled homes to give them emotional and financial

support, and during that time he was never accused of wrongdoing.  Doc. No.225 at 161- 176.

Instead, by not requesting a proffer, Defendant argues the Government was able to use these

traits against Defendant throughout the trial, including during the testimony of Dr. Valliere, an

expert witness presented by the Government.  Dr. Valliere served as what the Government terms

as a "blind witness," meaning that she knew nothing about the allegations of the minor child

victims, and instead, testified about what factors might influence how a child responds to sexual

abuse and grooming conduct.  Doc. No. 247 at 35.

### Defendant cannot demonstrate prejudice under *Strickland*

To establish prejudice, Defendant must prove that but for the decision not to call

character witnesses, there is a reasonable probability that the outcome of the proceeding would

have been different. *See Reed v. Gavin*, Civ. Action No. 13-4257, 2014 WL 645232, at *5 (E.D.

Pa. Feb. 18, 2014) (internal citations omitted).  Again, a finding of prejudice is lacking here, as

there is no reason to believe that any further investigation into Defendant's pertinent character

traits, or in the unlikely event this Court ruled that such witness testimony was admissible, the

testimony of character witnesses would have possibly changed the outcome of the trial.

### Trial counsel's conduct was reasonable under *Strickland*

Defendant's dramatic statements that the Government "weaponized" Defendant's

"pertinent character traits" essentially repeats a losing argument that was raised on direct appeal:

that the testimony of the Government's expert, Dr. Valliere, was improper.  In fact, the Court of

Appeals for The Third Circuit addressed and rejected this contention on direct appeal in this

case. *United States v. Leroy*, 787 Fed. App'x 74, 79-80 (3d Cir. 2019) (unpublished). The Court

of Appeals found that "[t]he fact that the jury may have drawn comparisons between Leroy's

relationships with [MK] and [MD] and the relationships Dr. Valliere described does not make

the latter's testimony unduly prejudicial." *Id.* To that end, this Court finds persuasive the Government's analogy that, "[j]ust as Dr. Valliere's testimony did not constitute "vouching" or "bolstering" of the minor victims, id., it was not evidence of Defendant's "bad character." Doc. No. 247 at 46.

Defendant acknowledges, as he must, that this Court previously ruled that such evidence was inadmissible. Doc. No. 66. In trial counsel's Affidavit, he responded that his decision not to challenge what he saw as evidence relating to Rule 404 was based on his "professional experience and understanding of the federal rules of evidence." In other words, it was part of the tactical and strategic decisions trial counsel made, and unless objectively unreasonable, it cannot form the basis for a successful claim. Doc. No. 238-1, at 6-7. Defendant has not demonstrated that trial counsel acted unreasonably under the prevailing norms of the profession, and this claim fails.

### (6) Trial counsel was not ineffective in advising Defendant about not testifying because the investigation preceding this advice and the investigation was not objectively unreasonable.

Defendant's sixth argument centers upon his position that trial counsel was ineffective because he improperly advised Defendant not to testify after conducting an objectively unreasonable investigation. The Court has ruled that trial counsel's failure to investigate or call certain witnesses does not constitute a deficient performance of trial counsel's duties. Nonetheless, after considering Defendant's Affidavit, and trial counsel's Affidavit, in essence, Defendant's argument is that his testimony could have convinced the jury to believe his side of the story (e.g., Doc. No. 221-1, at 13 – Defendant's blanket denial of MK's testimony regarding trips to Texas and Florida). The parties agree that trial counsel voiced his professional opinion to

Defendant, and it is also clear from both the Affidavit of trial counsel, and the Court record, that Defendant made his own voluntary decision not to testify.

### Defendant has failed to show prejudice under *Strickland* for his decision not to testify.

After considering Defendant's proposed testimony, it is insufficient to satisfy *Strickland's* prejudice prong.  Not only has Defendant failed to demonstrate that his testimony could have helped him, the Court finds the exact opposite could have occurred. The documentary evidence would have refuted many of his allegations, which would have resulted in an explosively damaging situation, or as trial counsel contends, Defendant would have been required to issue blanket denials of documentary exhibits.  There is no reason to believe, much less a reasonable possibility, that Defendant's choice to testify could have or would have changed the result of the trial.

### Trial counsel acted reasonably in advising Defendant under *Strickland*

The trial record elucidates that Defendant, in consultation with his counsel, carefully weighed his decision to testify and Defendant ultimately decided against testifying.  In this case, as in all criminal trials, the Court conducted a colloquy of Defendant outside the presence of the jury to make certain that he understood the risks and benefits of testifying or not testifying.

Specifically, at the end of day two of the three-day trial, the Government rested its case, and Defendant orally motioned for a judgment of acquittal as to the charges related to MD, which this Court orally denied.

Then, at sidebar, the following off-the-record exchange occurred with Defendant present.

THE COURT: Do you plan to put on a defense?
MR. TOWNSEND: I need to speak to my client. I plan on it, but I need to speak to him.
THE COURT: You want to just take a few moments now? I'm just trying to figure out the schedule. So, if you we to do that now for me?

MR. TOWNSEND: Okay.

THE COURT: Please. Thank you.

(Whereupon, an off-the-record discussion was had.)

MR. TOWNSEND: More than a few moments?

THE COURT: To talk to him?

MR. TOWNSEND: Yes. I need to really discuss today's testimony.

THE COURT: No. That's fair. That's fair. Help me understand the logistics of his going back to Ohio and your needing to talk to him. You want him held for some period of time, which I'll order? I just want to know.

MR. TOWNSEND: I mean, if I have at least forty-five minutes?

THE COURT: Okay. Once you make a decision, will you communicate whether or not you're going to have any live witnesses tomorrow and send an e-mail to my law clerk and to government counsel? Is that fair?

MR. TOWNSEND: That's fair.

THE COURT: Okay. That way we'll know what tomorrow looks like. We're going to break for the day, but defense counsel needs to talk to him for at least till five o'clock. Is that all right:

THE MARSHAL: Yes, Your Honor. That's fine.

THE COURT: Is there anybody else that needs transported back or is he the sole person?

THE MARSHAL: I believe there's a few others.

THE COURT: I would like defense counsel to have as much time to talk to the defendant before he's returned.

THE MARSHAL: Yes, sir.

THE COURT: Is the plan acceptable?

MR. TOWNSEND: Oh, yes.

MS. SONG: So, you'll e-mail by the end of the day?

THE COURT: How about by 8:00 p.m.?

MR. TOWNSEND: Yes. I should be home by then. I should be back in my office by then.

Doc. No. 206 at 283.

The Court then broke early for the day (at 4:15 p.m.), in order to give trial counsel and Defendant adequate time to talk. Doc. No. 112; Doc. No. 206 at 284-285. When trial resumed the next day at 9:00 am, outside the presence of the jury, but in open court, and after Defendant was sworn in under penalty of perjury, the following colloquy of Defendant and his counsel occurred:

THE COURT: On behalf of the defendant, has the defendant made a decision as to whether the defendant's going to offer any evidence in defendant's case-in-chief?

MR. TOWNSEND: He has, Your Honor, and he has decided not to present evidence in his case-in-chief.

THE COURT: Okay. Do you believe, counsel, that you have had adequate time to discuss this matter with the defendant?

MR. TOWNSEND: I do.

THE COURT: And you've discussed with him the benefits and risks of this decision?

MR. TOWNSEND: I have.

THE COURT: Sir, have you had adequate time to talk to your counsel about the matter, as to whether to put on any evidence in the defendant's case-in-chief?

THE DEFENDANT: Yes.

THE COURT: Did he thoroughly discuss with you the benefits and risks of such a decision?

THE DEFENDANT: Yes.

THE COURT: And you agree with that decision?

THE DEFENDANT: Yes.

THE COURT: And that is your decision that you have made voluntarily; correct?

THE DEFENDANT: Yes.

THE COURT: Do you need any other, do you need any additional time to talk to your counsel on this important matter?

THE DEFENDANT: No.

THE COURT: Thank you. You may be seated and be comfortable.

Doc. No. 207 at 3-5.

In trial counsel's Affidavit, he confirms that he discussed with Defendant "the advantages and disadvantages," of him testifying at trial, and that he so advised Defendant that, in his professional opinion, that it was in Defendant's best interest not to testify. Doc. No. 238-1 at 7. Trial counsel further declares in his statement that it was Defendant's "sole decision," whether he testified, which is further bolstered by Defendant's sworn testimony before this Court. (See

above at Doc. No. 207 at 5) ("And that is your decision that you have made voluntarily, correct? Defendant answered Yes.").

The Court has held that there is more than sufficient evidence to support the verdict in this case, including the testimony of the child victims, MK, MD, and MS.  The Court previously ruled that they provided consistent testimony that has been substantiated by the documentary evidence in this case.

As explained above, trial counsel's advice to Defendant to not testify was not unreasonable, especially because counsel's trial strategy was to hold the Government to its burden, as demonstrated by the record. See Doc. No. 207 (discussing in closing argument Defendant's decision not to testify; the presumption of innocence; and reviewing how the Government had not met its burden of proof); see also Doc. No. 221-1 at 23 (Defendant stated that when discussing whether he should testify that trial counsel told him: "The Government didn't meet its burden").  A Defendant's disagreement with trial tactics made in hindsight does not equal unreasonably conduct of trial counsel. *See United States v. Hester*, 489 F.2d 48, 50 (8th Cir. 1973).  In hindsight, Defendant may believe he should have testified, but the trial record reveals that he made a knowing and voluntary decision to not testify, that was not compelled by his trial counsel or anyone else.  Counsel acted reasonably under *Strickland* and this claim also fails.

**(7)  Defendant's allegations of cumulative prejudicial impact are without merit.**

Although not technically styled as a distinct and separate claim for relief, throughout Defendant's Amended Motion to Vacate, and especially at pages 181-182 of Doc. No. 221, he advances allegations of the cumulative prejudicial impact of trial counsel's numerous "errors" (plural) and relies upon the plural use of the word "errors" in *Strickland*, also citing *Wiggins v.*

*Smith*, 539 U.S. at 534, and the eight Court of Appeals outside of this Circuit, who have held that prejudice is considered cumulatively, and that "no separate cumulative error claim – raised under the Due Process Clause – must be pled."  Doc. No. 221 at 109, 114, 156, 175, 181-182; Doc. No. 241 at 147; Doc. No. 253 at 132.   In Defendant's Supplemental Amended Motion and in his Reply, he then claims that he has raised "stand alone claims" of cumulative prejudicial impact of alleged trial counsel errors.   Doc. No. 241 at 147; Doc. No.  253 at 132.

Without resolving one way or the other the question of whether Defendant has properly "pled" a "stand alone claim," or whether a separately and independently "pled" claim alleging cumulative errors is even required, this Court has considered Defendant's allegations of trial counsel's errors through the lens of a cumulative prejudicial impact claim.  Although perhaps not technically titled as a separate claim for relief, at pages 181-182 of Doc. No. 221, Defendant states the following:

### CUMULATIVE *STRICKLAND* PREJUDICE

Jim Leroy is entitled to a new trial based on each individual *Strickland* claim. *Strickland* prejudice, though, must be assessed cumulatively. Supra, p. 100. Collectively, then, the Court must consider the impact of the following facts, witnesses, and testimony:

First, the innumerable inconsistencies trial counsel failed to introduce to the jury regarding MK's and MD's many statements as well as their trial testimony. These countless and substantial inconsistencies would've raised reasonable doubts regarding MD's and MK's credibility.

Second, Luke Durci's testimony that would've utterly devastated not only MD's and MK's Michigan narratives, but also their credibility. If MD and MK had any credibility left after Luke testified, the numerous and substantial inconsistencies pled in Claim #1 would've entirely destroyed whatever credibility they had left.

Third, if MD and MK – somehow – had any credibility left after their numerous and substantial inconsistences were exposed and Luke Durci testified, Billy Stuteville, Tim Butler, and Nikki Matthews would've – without question – entirely extinguished whatever credibility was left because all three saw and heard MK and MS confess to fabricating their allegations against Jim.

Fourth, the numerous witnesses who would've educated the jury about MK and MS's reputations for dishonesty would've simply reinforced what the jury – hopefully – by then would've figured out, namely that MK, MD, and MS are dishonest, misguided juveniles and their claims against Jim are fabricated.

Fifth, the countless character witnesses would've simply driven home what – by then – would've been painfully obvious: Jim didn't sexually abuse or endanger these boys because he's not a sexual predator. Instead, Jim is – and has always been – a man of God, doing God's work and helping those who need employment, support, and salvation.

Sixth, Jim's testimony would've simply tied together all his other defense witnesses. Consequently, it's reasonably probable, had trial counsel not committed the errors pled in Claims 1 through 6, the collective impact of this would've altered at least one juror's assessment of MK's, MD's, and MS's credibility, so much so this juror would've had reasonable doubts regarding Counts 1 through 4.

The cumulative prejudice, therefore, entitles Jim Leroy to a new trial.

Doc. No. 241 at 181-182.

**Defendant has failed to show 'actual' prejudice under *Strickland***

Defendant correctly explains that the issue of whether prejudice may be assessed from a cumulative perspective "is still an open question" in the United States Court of Appeals for the Third Circuit. *Zeledjieski v. Superintendent Greene SCI*, 833 F. App'x 950, 957 (3d Cir. 2020) ("We have not yet decided whether any prejudice from multiple claims of deficient performance should be analyzed together under *Strickland* or as cumulative error under the Due Process Clause.").

The Government concedes, citing *Alrbrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) that, "errors that individually do not warrant habeas relief may do so when combined," but they do not always do so.  *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007).  However, "a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.'" *Id.* (*quoting Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Reviewing the totality of the evidence submitted by Defendant, this Court finds that Defendant has not established actual prejudice because he "has failed to show that this evidence is material even when viewed collectively." *Lesko v. Secretary Pennsylvania Dep't of Corrections*, 34 F.4th 211, 234 (3d Cir. 2022).

**Trial counsel acted reasonably under *Strickland***

Defendant has failed to demonstrate that trial counsel committed "errors" or performed deficiently. This Court has considered each claim in Defendant's instant Motions in the context of whether trial counsel acted unreasonably or whether he performed deficiently under the prevailing norms of the profession. Nowhere in this Memorandum Opinion does the Court find that trial counsel performed deficiently by committing one or more actual errors. Accordingly, this cumulative error claim fails. Doc. No. 247 at 84-85.

**VI.    Conclusion**

Defendant was convicted by a jury of his peers, on the basis of more than ample evidence, and materially consistent testimony by the two minor victims MK and MD, as well as corroborative testimony by another victim who credibly testified to suffering substantially similar abuse by Defendant as a minor (MS). The credible testimonial evidence of eight Government witnesses was bolstered by corroborating documentary evidence that Defendant transported MK and MD from Pennsylvania and traveled across state lines with the intent to engage in illegal sexual conduct with those child victims.

Having presided over the pretrial and trial proceedings, this Court finds that Defendant's able and experienced privately retained trial counsel put forth a cogent defense, including conducting a reasonable investigation, filing and responding to numerous pretrial motions, advancing and objecting to final jury instructions/verdict slips, conducting appropriate and

reasonable cross-examination of witnesses, and making rational arguments before the jury, which were proper and supportive of his defense theory of the case.  Trial counsel's overall trial strategy, albeit ultimately unsuccessful, due to the weight of the evidence against his client, was consistent, reasonable and within the norms of professional conduct.

As the saying goes "hindsight is 20/20," and current defense counsel literally spends hundreds of pages critiquing and litigating so many aspects of the trial counsel's performance and decisions, they are difficult to condense. In light of the overwhelming credible testimony and documentary evidence, it is difficult to imagine another trial strategy that could have possibly proven more effective or produced a different result.  This Court concludes that trial counsel was not deficient, and that, most critically, Defendant suffered no prejudice at the hands of his chosen trial counsel on his chosen trial date.

A court should issue a certificate of appealability (COA) where a petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  A petitioner meets this burden by showing: (1) where a court has rejected the constitutional claim on the merits that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong[,]" or (2) "[w]hen the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, the Court finds that Defendant has not met his burden of making such a showing, and thus, a certificate of appealability will not issue.  Because Defendant's myriad claims fail as

a matter of law, no hearing is necessary, and Defendant's Motions will be denied.  An

appropriate Order follows.


This 27th day of April, 2023

s/Arthur J. Schwab
United States District Judge


cc:      All Registered ECF Counsel and Parties